ELGIN, JOLIET & EASTERN RAILWAY CO. *v.*
BURLEY ET AL.

No. 160.   Argued November 15, 1945.—Decided June 11, 1945.

*Mr. Paul R. Conaghan* for petitioner.

*Mr. John H. Gately,* with whom *Mr. Gerald J. Koptik*
was on the brief, for respondents.

Mr. Justice Rutledge delivered the opinion of the Court..

This cause, arising upon an amended complaint,[1] brings for decision novel and important questions concerning the authority of a collective bargaining representative, affecting the operation of the Railway Labor Act of 1934. 48 Stat. 1185, 45 U. S. C. § 151 ff. The ultimate issues are whether such an agent has authority, by virtue of the Act or otherwise, either to compromise and settle accrued monetary claims of ten employees or to submit them for determination by the National Railroad Adjustment Board to the exclusion of their right, after the settlement and after the Board's adverse decision, to assert them in a suit brought for that purpose. The claims are for "penalty damages" for alleged violation of the starting time provisions of a collective agreement, varying from $3,500 to $14,000, and in the aggregate amounting to $65,274.00.[2]

The District Court rendered summary judgment for the carrier, holding that the Board's award was a final adjudication of the claims, within the union's power to seek and the Board's to make, precluding judicial review.[3] The Court of Appeals reversed the judgment, 140 F. 2d 488, holding that the record presented a question of fact

---

[1] Amendments were allowed to cure jurisdictional defects found to exist upon an earlier appeal. *Alderman* v. *Elgin, J. & E. R. Co.*, 125 F. 2d 971.

[2] The record sets forth no provision for penalty damages. But the complaint alleges that under the terms of the agreement each of the plaintiffs is entitled to "pay for an additional day, at time and one-half, at the regular daily rate" for each day he was required to work contrary to the agreement's terms.

[3] The court said: "I think that the controversy was submitted to the Board, that it had jurisdiction and that it was decided, and that the plaintiffs were represented there and are bound thereby. . . . I think the ruling of the Adjustment Board was binding upon the plaintiffs as well as upon the defendant, and that it is binding on this court in this proceeding."

whether the union had been authorized by respondents "to negotiate, compromise and settle" the claims. We granted certiorari, 323 U. S. 690, in order to resolve the important questions affecting application and operation of the Act.

A statement of the more important facts will put the issues in sharper perspective. The controversy relates to operations in petitioner's so-called "Whiting Yard." Prior to July 24, 1934, respondents, or some of them, were employed by the Standard Oil Company to do private intra-plant switching in its Whiting, Indiana, plant. On that date this work was taken over by petitioner. Until then Standard Oil's switching crews began work each day at hours fixed in advance by the management, which varied as plant operations required.

Prior to 1934 petitioner's crews at all yards in Indiana and Illinois began work daily in accordance with starting time provisions contained in Article 6 of a collective agreement made in 1927 between petitioner and the Brotherhood of Railroad Trainmen, governing rules, working conditions and rates of pay of yardmen.

Upon transfer of the Whiting yard switching to petitioner, respondents theretofore employed by Standard Oil became employees of petitioner and members of the Brotherhood. On July 24, 1934, company officials conferred with representatives of the engineers, the firemen and the yardmen concerning terms of employment. The Brotherhood acted for the yardmen. Apparently agreement was reached on all matters except starting time but, as to that, versions of what transpired differ. Respondents and the Brotherhood have maintained that the 1927 agreement, including Article 6, became applicable to them upon the transfer. They say, however, that they assented to a suspension of Article 6 for thirty days from July 27, 1934, to enable the company to work out adjustment to the plant's operations, and accordingly it governed their relation with petitioner from August 26, 1934.

The company has insisted that Article 6 did not become applicable to respondents upon the transfer and that it made no agreement to apply Article 6, other than to follow it as closely as possible, prior to October 31, 1938, when it and the Brotherhood eventually agreed to place Whiting yard crews on fixed starting time, under circumstances to be noted.

Whichever version is true, a long controversy resulted. The carrier continued to follow the former practice, although departures from the schedule were reduced, as it claims, in conformity with the oral undertaking to observe it as far as possible. The work went on without interruption. But numerous complaints on account of departures were made through local officers of the Brotherhood. Time slips were filed by the employees. Frequent negotiations took place. None however resulted in a settlement prior to October 31, 1938.

In this state of affairs, respondents authorized the Brotherhood to file complaint with the National Railroad Adjustment Board for violation of Article 6. This was done on November 23, 1936. The "statement of claim" was signed and filed by Williams, chairman of the general grievance committee. It asserted that the carrier, having "placed the employees under the agreement of the yardmen," had "failed to put into effect the starting time provisions" of Article 6, and denied that violation was justified either because the carrier had agreed with the Engineers to follow the formerly prevailing practice or by the carrier's claim that the work could be done in no other way. The submission was intended to secure compliance. There was no prayer for money damages. Petitioner maintained that Article 6 was not applicable.

The Board, following its customary procedure,[4] docketed the claim as No. 3537, notified the carrier and the

---

[4] The procedure, though informal, consists principally in written statements or "submissions" filed by the parties, which perform the functions of pleading and evidence combined, and oral argument upon

union that the case, with many others docketed at the same time, was "assumed to be complete," and forwarded to each copies of the other's submissions.  The record does not disclose what followed until nearly two years later.

On October 31, 1938, Williams and Johnson, secretary of the Brotherhood, two of the grievance committee's three members, accepted an offer made by petitioner's president, Rogers, to settle the claim.  The settlement took the form of a proposal, made in a letter by Rogers to Williams, to settle some 61 different claims, including "Labor Board Docket No. 3537—Starting time of switch engines in Whiting S. O. Yard."  Williams and Johnson endorsed acceptance for the Brotherhood and the yardmen on the letter.  Because of its importance, pertinent portions are set forth in the margin.[5]  On the day the settlement was concluded

the submissions thus made.  See Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency (1937) 46 Yale L. J. 567, for a detailed description of the procedure.  See also Final Report of the Attorney General's Committee on Administrative Procedure (1941) 185 ff.; Administrative Procedure in Government Agencies, Sen. Doc. No. 10, Part IV, 77th Cong., 1st Sess.

[5] The letter was addressed to Williams, as general chairman of the Brotherhood, and dated October 28, 1938.  It stated:

"Since my letter of August 18th in which I tentatively proposed settlement of certain matters of grievance we have had further correspondence and conferences which have modified our decision in some cases.  Therefore, in order that the whole matter be placed in concrete form I am outlining below our proposals to settle all of the cases except as otherwise specified.

.          .          .          .          .

"Case No. 5—Labor Board Docket #3537—Starting time of switch engines in Whiting S. O. Yard.

"Settled by agreement that *the starting times for a ninety day trial period* commencing November 15th, 1938, *shall be the times provided for in Article 6* of the Yardmen's Agreement *instead of the starting times heretofore agreed upon and now being followed*.  If at the end of the ninety day trial period the Railway Company or its employees claim that the starting times as fixed in Article 6 do not result in efficient and economical operation and in satisfaction to our employees

Rogers and Williams advised the Board of it by letter and jointly requested that the case be withdrawn from the docket, which accordingly was done.

Notwithstanding the settlement, a further dispute arose. In March, 1939, the Brotherhood, through Williams, requested the carrier to furnish a complete list of crews in the Whiting yard started at times other than those fixed by Article 6 from August 27, 1934, to November 15, 1938, when the settlement became effective. The company declined to furnish the list, stating it was at a loss to understand the reason for the request in view of the settlement.

The upshot of the dispute was the filing of another claim with the Board, Docket No. 7324, on May 18, 1939, by Williams, acting for the Brotherhood. This submission

and to the industry served, then representatives of the Railway Company and representatives of the Yardmen, and representatives of the Engineers and representatives of the Firemen *will sit down and work out a schedule of starting time best suited for meeting the special requirements of the industry.*

.         .         .         .         .

"We have by this letter given you a complete résumé of all of the claims which have not heretofore been disposed of, filed by you on behalf of the employees whom you represent and have proposed in this letter a very liberal disposition of all the cases involved. The settlements proposed are predicated on *a complete settlement and withdrawal of all cases now pending* either before the board, *or under discussion with this office except Case No. 4,* which it is understood will be left to a decision by the National Railroad Adjustment Board, *and it is further understood that in the event these settlements are accepted that the claims listed in this letter cover all claims of a similar nature, and that no other claims covering the same or like situations will be presented when such claims arise from causes occurring prior to the date of this settlement.* [Emphasis added.]

"Yours truly,

"S. M. ROGERS, *President.*

"Accepted for the Yardmen: Oct. 31, 1938.

"C. H. Williams, General Chairman, B. of R. T.

"S. F. Johnson, Secretary, B. of R. T."

was "for one day's pay at time and one-half for each fore-man and each helper for each day they were required to work in yard service in the Whiting (Standard Oil Company) Yard, in violation of the fixed starting time provided for in Article No. 6 of the Yardmen's Agreement . . . effective January 1, 1927, and applicable to Whiting (Standard Oil Company) Yardmen, July 27, 1934, from dates of August 27, 1934, until November 14, 1938, inclusive."

The submission not only maintained the applicability of Article 6 and accrual of the individual claims asserted. It also maintained that the settlement of October 31, 1938, was effective only to fix the starting time for the future and had no effect to waive or determine individual claims for penalty damages accrued prior to the settlement.[6]

The carrier's submission reiterated its position in Case No. 3537. It also relied upon the settlement as precluding later assertion of any claim, individual or collective, based upon occurrences prior to the date of the settlement.

The matter went to decision by the Board. Under the procedure prescribed in case of deadlock, cf. § 3 First (1),

---

[6] Cf. note 5. The submission stated: "There were no agreements reached whereby payment for violation of Article No. 6 of the Yardmen's Agreement would be waived as a result of withdrawal of Labor Board Docket No. 3537. *In fact that case held no claim for payment for time. It was simply a case to settle* the dispute as to *the carrier's right to force the yard crews* in the Whiting yard *to work at times other than the fixed starting time* provided for in Article 6 . . .

"As stated before, Case No. 5—Labor Board Docket No. 3537 *contained no claim for pay* to Whiting Yardmen. *Consequently it was not a question before the Management and the Committee in the* starting time *negotiation* and claim cannot be made that a waiver was made on a matter which was not negotiated."

The submission also denied that oral agreements relating to starting time, claimed by the carrier to have been made at the time of the transfer in 1934, could be effective "to invalidate the prescribed written rule of Article 6." Williams however did not question the validity of the verbal agreement, as he maintained, for the thirty-day suspension.

a referee was called in. The award was made by the First Division on September 6, 1940. It sustained the Board's jurisdiction,[7] found that "the parties to said dispute were given due notice of hearing thereon," and held that "the evidence shows that the parties to the agreement disposed of the claim here made by the letter of carrier dated October 28, 1938, accepted by employees October 31, 1938." Accordingly the claim was "denied per findings."

Thereafter, on November 19, 1940, the present suit was instituted. As has been noted, the case comes here after a summary judgment rendered on the carrier's motion, supported by the affidavit of its vice president. This in effect set up the compromise agreement and the award in Case No. 7324 as bases for the judgment sought.

The range and precise nature of the issues may be summarized best perhaps as they were shaped upon respondents' opposition to the carrier's motion. They denied that either Williams or the union had authority to release their individual claims or to submit them for decision by the Board. They relied upon provisions of the Brotherhood's constitution and rules,[8] of which the carrier was alleged to have knowledge, as forbidding union officials to release individual claims or to submit them to the Board "without specific authority so to do granted by the individual members themselves"; and denied that such authority in either respect had been given.

The validity and the conclusive effect of the award were challenged also upon other grounds, among them that

---

[7] The submissions in no way challenged the jurisdiction of the Board or of the Division.

[8] See Part III. The provisions regulate the union's internal procedure in relation to making changes in a "general or system wage schedule or agreement," Rule No. 3, and that to be followed when the local chairman or grievance committee fails "satisfactorily to adjust any grievance referred to it." Rule No. 7. The latter includes a provision that "a general grievance committee may authorize their chairman to handle all grievances received from local lodges." See also note 40.

respondents individually received no notice of the submission or the hearing until after the award was made; that since the award denied a claim for money damages, it was within the exception of § 3 First (m), which provides that "the awards shall be final and binding upon both parties to the dispute, except in so far as they shall contain a money award," and therefore did not preclude this suit; and that the Act, if construed to make the award conclusive, would violate the Fifth Amendment's due process provision by denying judicial review to defeated employees, though allowing it to defeated employers. Cf. § 3 First (p), (q); *Washington Terminal Co.* v. *Boswell,* 124 F. 2d 235, affirmed by an equally divided Court, 319 U. S. 732.

Finally respondents suggested most sweepingly that the Board may act "merely as an arbitrator," with the result that "any decisions thereunder are void because it passes on matters and bases its decision and its opinion on law and fact which is contrary to public policy." The prayer was that the court overrule the carrier's motion for summary judgment and, in doing so, determine that the release was not effective; the award was not a final adjudication of the claims; and the award was void for lack of jurisdiction of the parties or the subject matter or "because said Act under which award was entered is unconstitutional."

The District Court's judgment rested squarely on the conclusive effect of the award in Docket No. 7324. It did not indicate whether it regarded the Brotherhood's authority to submit the claims and appear for the employees as derived from the statute or, apart from the statute, as a matter of law upon the particular facts. But it must be taken to have held that, upon the pleadings and the affidavits, no genuine issue of material fact was presented, Fed. Rules Civ. Proc., Rule 56 (c), and therefore that it was immaterial if, as alleged, respondents had not individually given the Brotherhood or Williams specific authority

to submit their claims for decision or represent them in the hearings.

The Court of Appeals, however, made no reference to the issues concerning the award and its effect upon the claims. But its judgment must be taken to have determined implicitly that none of petitioner's contentions in these respects is valid.

The issues are not merely, as the Court of Appeals assumed, whether the Brotherhood had authority to compromise and settle the claims by agreement with the carrier and whether on the record this presents a question of fact. For petitioner insists, and the District Court held, that the award of the Board was validly made, and is final, precluding judicial review. We do not reach the questions of finality, which turn upon construction of the statutory provisions and their constitutional validity as construed.[9] Those questions should not be determined unless the award was validly made, which presents, in our opinion, the crucial question. Respondents attack the validity and legal effectiveness of the award in three ways. Two strike at its validity on narrow grounds. Respondents say the Brotherhood had no power to submit the dispute for decision by the Board without authority given by each of them individually and that no such authority was given. They also maintain that they were entitled to have notice individually of the proceedings before the Board and none was given.

The third and most sweeping contention undercuts all other issues concerning the award's effects, whether for validity or for finality. In substance it is that the award, when rendered, amounts to nothing more than an advisory opinion. The contention, founded upon language of the opinion in *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630, regards the Act's entire scheme for the settlement of grievances as wholly conciliatory in character, involving

---

[9] Cf. § 3 First (m), (o), (p), (q).

no element of legal effectiveness, with the consequence that the parties are entirely free to accept or ignore the Board's decision.

At the outset we put aside this broadest contention as inconsistent with the Act's terms, purposes and legislative history.[10] The *Moore* case involved no question concerning the validity or the legal effectiveness of an award when rendered.[11] Nor did it purport to determine that the Act creates no legal obligations through an award or otherwise. Apart from the affirmance by equal division in *Washington Terminal Co.* v. *Boswell, supra,* both prior and later decisions here are wholly inconsistent with such a view of its effects. Cf. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515; *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548; [12] *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297; *General Committee* v.

---

[10] Cf. Part I.

[11] It was held that nothing in the Act "purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court," 312 U. S. at 634; and therefore the employee's suit could be maintained against the carrier without prior resort to the Adjustment Board. Among the reasons assigned was that the machinery provided for settling disputes was not "based on a philosophy of legal compulsion" but created "a system for peaceful adjustment and mediation voluntary in its nature."

The problem presented was whether the Adjustment Board procedure either was exclusive or was an essential preliminary to judicial proceedings within the doctrine of primary jurisdiction. These were questions not entirely determinable by the criterion of whether the procedure is wholly advisory or conciliatory in character. For, conceivably, Congress might have made the taking of the Board's merely advisory opinion a condition precedent to asking for judicial relief; and, conversely, allowing that relief without prior resort to the Board does not necessarily make the Board's action, when taken, merely advisory.

[12] Thus, one of the statute's primary commands, judicially enforceable, is found in the repeated declaration of a duty upon all parties to a dispute to negotiate for its settlement. See note 26; *Virginian*

*M.-K.-T. R. Co.,* 320 U. S. 323; *General Committee* v. *Southern Pacific Co.,* 320 U. S. 338.

I

The difference between disputes over grievances and disputes concerning the making of collective agreements is traditional in railway labor affairs. It has assumed large importance in the Railway Labor Act of 1934, substantively and procedurally.[13] It divides the jurisdiction and functions of the Adjustment Board from those of the Mediation Board, giving them their distinct characters. It also affects the parts to be played by the collective agent and the represented employees, first in negotiations for settlement in conference and later in the quite different procedures which the Act creates for disposing of the two types of dispute. Cf. §§ 3, 4.

The statute first marks the distinction in § 2, which states as among the Act's five general purposes: "(4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." The two sorts of dispute are sharply distinguished,[14] though there are points of common treatment. Nevertheless, ·it is clear from the Act itself, from the history of railway labor dis-

---

*R. Co.* v. *System Federation,* 300 U. S. 515; cf. *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297, 300, 320; *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323, 331, 334. This duty is not merely perfunctory. Good faith exhaustion of the possibility of agreement is required to fulfill it. Cf. *Virginian R. Co.* v. *System Federation, supra,* at 548, 550; *Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50, 56 ff. At successive stages of the statutory procedure other duties are imposed. Cf. §§ 5 First (b), 6, 10.

[13] Cf. the references cited in notes 4 and 15.

[14] Cf. text Part II at note 38; also *Hughes Tool Co.* v. *Labor Board,* 147 F. 2d 69, 72, 73.

putes and from the legislative history of the various statutes which have dealt with them,[15] that Congress has drawn major lines of difference between the two classes of controversy.

The first relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e. g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world.[16] The former present the large issues

---

[15] See the references cited in note 4; Hearings before Committee on Interstate Commerce on H. R. 7650, 73d Cong., 2d Sess.; Hearings before Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess.; *Pennsylvania R. Co.* v. *Railroad Labor Board,* 261 U. S. 72; *Pennsylvania System Federation* v. *Pennsylvania R. Co.,* 267 U. S. 203; *Texas & N. O. R. Co.* v. *Brotherhood,* 281 U. S. 548; *Virginian R. Co.* v. *System Federation,* 300 U. S. 515.

[16] Cf. the references cited in note 4. Commissioner (also Coordinator) Eastman, who very largely drafted the 1934 amendments, said in testifying at the House Committee hearings concerning them:

"Please note that disputes concerning changes in rates of pay, rules, or working conditions may not be so referred [to the National Adjust-

about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.

The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so.[17] Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment.

Broadly, the statute as amended marks out two distinct routes for settlement of the two classes of dispute, respectively, each consisting of three stages. The Act treats the two types of dispute alike in requiring negotiation as the first step toward settlement and therefore in contemplating voluntary action for both at this stage, in the sense that agreement is sought and cannot be compelled. To

---

ment Board], but are to be handled, when unadjusted, through the process of mediation. The national adjustment board is to handle only the minor cases growing out of grievances or out of the interpretation or application of agreements." Hearings before Committee on Interstate Commerce on H. R. 7650, 73d Cong., 2d Sess., 47; cf. also pp. 49, 51, 59, 62. And see the testimony of Harrison, a principal union proponent, before the House Committee, *id.*, at 80–83; and before the Senate Committee, Hearings before Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., 33, 35.

[17] Cf. the testimony of Eastman and Harrison, cited in note 16.

induce agreement, however, the duty to negotiate is imposed for both grievances and major disputes.[18]

Beyond the initial stages of negotiation and conference, however, the procedures diverge. "Major disputes" go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. § 7; *Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration.

The course prescribed for the settlement of grievances is very different beyond the initial stage. Thereafter the Act does not leave the parties wholly free, at their own will, to agree or not to agree. On the contrary, one of the main purposes of the 1934 amendments was to provide a more effective process of settlement.[19]

Prior to 1934 the parties were free at all times to go to court to settle these disputes. Notwithstanding the contrary intent of the 1926 Act, each also had the power, if

---

[18] Cf. note 12; also notes 26, 27, and text *infra*. The obligation is not partial. In plain terms the duty is laid on carrier and employees alike, together with their representatives; and in equally plain terms it applies to all disputes covered by the Act, whether major or minor.

[19] H. Rep. No. 1944 on H. R. 9861, 73d Cong., 2d Sess., 3; S. Rep. No. 1065 on S. 3266, 73d Cong., 2d Sess., 1, 2.

not the right, to defeat the intended settlement of grievances by declining to join in creating the local boards of adjustment provided for by that Act. They exercised this power to the limit. Deadlock became the common practice, making decision impossible. The result was a complete breakdown in the practical working of the machinery. Grievances accumulated and stagnated until the mass assumed the proportions of a major dispute. Several organizations took strike ballots and thus threatened to interrupt traffic, a factor which among others induced the Coordinator of Transportation to become the principal author and advocate of the amendments. The sponsor in the House insisted that Congress act upon them before adjournment for fear that if no action were taken a railroad crisis might take place.[20] The old Mediation Board was helpless.[21] To break this log jam, and at the same time to get grievances out of the way of the settling of major disputes through the functioning of the Mediation Board, the Adjustment Board was created and given power to decide them.[22]

---

[20] Cf. 78 Cong. Rec. 12553. Coordinator Eastman referred, in his ' testimony, to four recent strike votes occasioned by deadlock. Hearings before Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., 17.

[21] The Chairman told the Senate Committee: "The provision in the present act [1926] for adjustment boards is in practice about as near a fool provision as anything could possibly be. I mean this— that on the face of it they shall, by agreement, do so and so. Well, you can do pretty nearly anything by agreement, but how can you get them to agree?" Hearings before Committee on Interstate Commerce on S. 3266, 73d Cong., 2d Sess., 137.

[22] See, for a general view of the circumstances inducing enactment of the 1934 Amendments, the references cited above in notes 4, 15, 16, 19. The report of the House Committee in charge of the bill stated:

"Many thousands of these disputes have been considered by boards established under the Railway Labor Act; but the boards have been unable to reach a majority decision, and so the proceedings have been

The procedure adopted is not one of mediation and conciliation only, like that provided for major disputes under the auspices of the Mediation Board. Another tribunal of very different character is established with "jurisdiction" to determine grievances and make awards concerning them. Each party to the dispute may submit it for decision, whether or not the other is willing, provided he has himself discharged the initial duty of negotiation.[23]  § 3 First (i). Rights of notice, hearing, and participation or representation are given. § 3 First (j). In some instances judicial review and enforcement of awards are expressly provided or are contemplated. § 3 First (p); cf. § 3 First (m). When this is not done, the Act purports to make the Board's decisions "final and binding." § 3 First (m).

The procedure is in terms and purpose very different from the preexisting system of local boards. That system was in fact and effect nothing more than one for what respondents' call "voluntary arbitration." No dispute could be settled unless submitted by agreement of all parties. When one was submitted, deadlock was common and there was no way of escape. The Adjustment Board

---

deadlocked. These unadjusted disputes have become so numerous that on several occasions the employees have resorted to the issuance of strike ballots and threatened to interrupt interstate. commerce in order to secure an adjustment. This has made it necessary for the President of the United States to intervene and establish an emergency board to investigate the controversies. This condition should be corrected in the interest of industrial peace and of uninterrupted transportation service. This bill, therefore, provides for the establishment of a national board of adjustment to which these disputes may be submitted if they shall not have been adjusted in conference between the parties." H. Rep. No. 1944, 73d Cong., 2d Sess., 3. Cf. also the testimony of Coordinator Eastman, Hearings before Committee on Interstate Commerce on H. R. 7650, 73d Cong., 2d Sess., 49.

[23] Section 3 First (i) expressly conditions the right to move from negotiation into proceedings before the Adjustment Board upon "failing to reach an adjustment in this manner," i. e., by negotiation.

was created to remove the settlement of grievances from this stagnating process and bring them within a general and inclusive plan of decision.[24]   The aim was not to dispense with agreement.  It was to add decision where agreement fails and thus to safeguard the public as well as private interests against the harmful effects of the preexisting scheme.

II

The collective agent's power to act in the various stages of the statutory procedures is part of those procedures and necessarily is related to them in function, scope and purpose.

The statute itself vests exclusive authority to negotiate and to conclude agreements concerning major disputes in the duly selected collective agent.   Cf. *Virginian R. Co.* v. *System Federation, supra*.[25]   Since the entire statutory

---

[24] See the testimony of Coordinator Eastman and Mr. Harrison, cited in note 16.   The latter stated, at the Senate Committee hearings, pp. 33, 35:

". . . this has been a question for the last 14 years as to what kind of boards we are going to have to settle our grievances . . . We have always sought national boards; the railroads . . . have sought the system boards, regional boards . . .   Most of the boards . . . under the present law . . . have deadlocked on any number of cases.   As a result of that there was fast growing up in our industry a serious condition that might very well develop into substantial interruption of interstate commerce . . .   These *railway labor organizations have always opposed compulsory determination of their controversies*.   We have lived a long time and got a lot of experience, and we know that these minor cases that develop out of contracts that we make freely, and . . . *we are now ready to concede that we can risk having our grievances go to a board and get them determined, and that is a contribution that these organizations are willing to make*.   . . . if we are going to get a hodgepodge arrangement by law . . . then we don't want to give up that right, because we only give up the right because we feel that we will get a measure of justice by this machinery that we suggest here."   (Emphasis added.)

[25] Cf. also *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332.

procedure for settling major disputes is aimed only at securing agreement and not decision, unless the parties agree to arbitration, this exclusive authority includes representation of the employees not only in the stage of conference, but also in the later ones of mediation, arbitration and conciliation.

Whether or not the agent's exclusive power extends also to the settlement of grievances, in conference or in proceedings before the Board, presents more difficult questions. The statute does not expressly so declare. Nor does it explicitly exclude these functions. The questions therefore are to be determined by implication from the pertinent provisions. These are the ones relating to rights of participation in negotiations for settlement and in proceedings before the Board. They are in part identical with the provisions relating to major disputes, but not entirely so; and the differences are highly material.

The questions of power to bargain concerning grievances, that is, to conclude agreements for their settlement, and to represent aggrieved employees in proceedings before the Board are not identical. But they obviously are closely related in the statutory scheme and in fact. If the collective agent has exclusive power to settle grievances by agreement, a strong inference, though not necessarily conclusive, would follow for its exclusive power to represent the aggrieved employee before the Board. The converse also would be true. Accordingly it will be convenient to consider the two questions together.

The primary provisions affecting the duty to treat are found in § 2 First and Second, imposing the duty generally as to all disputes, both major and minor, and §§ 2 Sixth and 3 First (i), together with the proviso to § 2 Fourth, which apply specially to grievances. These sections in material part are set forth in the margin,[26] except the

---

[26] By § 2 First, *"It shall be the duty of all* carriers, their officers, agents, and *employees* to exert every reasonable effort to make and

proviso which is as follows: "Provided, That nothing in this Act shall be construed to prohibit a carrier from permitting *an employee, individually,* or local representatives of employees *from conferring* with management during

---

maintain agreements concerning rates of pay, rules, and working conditions, and *to settle all disputes,* whether arising out of *the application* of such agreements or otherwise, in order to avoid any interruption to commerce . . ." By § 2 Second, *"All* disputes between a carrier or carriers and its or their employees *shall be considered, and, if possible, decided,* with all expedition, in conference *between representatives designated and authorized* so to confer, respectively, by the carrier or carriers and *by the employees thereof interested in the dispute."* (Emphasis added.) These are the basic sections creating the duty, applicable to all disputes, major or minor, and to carriers and employees alike.

Other provisions affecting the general duty to treat are those of § 2 Third, that "representatives, *for the purposes of this Act,* shall be designated by the respective parties without interference" by the other and "need not be persons in the employ of the carrier"; of § 2 Fourth, that "the majority of any craft or class of employees shall have the right to determine who shall be *the representative of the craft or class for the purposes of this Act";* and of § 2 Eighth that "every carrier shall notify its employees by printed notices . . . that *all disputes* between the carrier and its employees *will be handled in accordance with the requirements of this Act."* (Emphasis added.)

Section 2 Sixth applies specially to grievances, as does § 3 First (i). The former provides: "In case of a dispute between a carrier or carriers and its or their employees, *arising out of grievances or out of the interpretation or application of agreements* concerning rates of pay, rules, or working conditions, *it shall be the duty of the designated representative* or representatives of such carrier or carriers and *of such employees,* within ten days after the receipt of notice of a desire on the part of either party *to confer* in respect to such dispute, to specify a time and place . . ." Section 3 First (i) is as follows: "The disputes between *an employee* or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on the date of approval of this Act, *shall be handled in the usual manner up to and including* the chief operating officer of the carrier designated to handle such disputes; but, *failing to reach an adjustment in this*

working hours *without loss of time,* or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization."[27] (Emphasis added.)

Relating to participation in the Board's proceedings, in addition to the concluding sentence of § 3 First (i), see note 26, is § 3 First (j), as follows: "Parties may be heard either *in person,* by counsel, or by other representatives, as they may respectively elect, and the several divisions of the Adjustment Board shall give due notice of all hearings *to the employee* or employees and the carrier or carriers involved in any dispute submitted to them." (Emphasis added.)

Petitioner urges that, notwithstanding the proviso and § 3 First (j), the effect of the provisions taken as a whole is to make the collective agent the employees' exclusive representative for the settlement of *all* disputes, both major and minor, and of the latter "whether arising out of the application of such [collective] agreements or otherwise." The argument rests primarily upon §§ 2 First, Second, Third, Fourth, Sixth, and 3 First (i). It emphasizes the carrier's duty to treat with the collective representative, as reinforced by §§ 2 Eighth and Tenth.[28]

Petitioner does not squarely deny that the aggrieved employee may confer with the carrier's local officials either

---

*manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with* a full statement of the facts and all supporting data bearing upon the disputes." (Emphasis added.)

[27] Section 2 Eighth makes this proviso part of the contract of employment between the carrier and each employee, and § 2 Tenth makes it a misdemeanor for the carrier to refuse to observe it. Section 2 Eighth incorporates the provisions of §§ 2 Third, Fourth and Fifth in each employee's contract of employment. Section 2 Tenth makes it a misdemeanor for the carrier to fail or refuse to comply with the terms of §§ 2 Third, Fourth, Fifth, Seventh and Eighth

[28] See note 27.

personally or through *local* union representatives in accordance with the proviso to § 2 Fourth. But this right, if it exists, is regarded apparently as at most one to be heard, since in petitioner's view the power to make settlement by agreement is vested exclusively in the collective agent. Cf. §§ 2 Sixth and 3 First (i).

The collective agent, as the carrier conceives the statute, is the "representative[s], designated and authorized to confer" within the meaning of § 2 Second, without distinction between major and minor disputes. It is likewise the "representative, for the purposes of this Act," again without distinction between the two types of dispute, in the selection of which by "the respective parties" § 2 Third forbids the other to interfere. It is also "the designated representative" of the employees with whom, by § 2 Sixth, the carrier is required to treat concerning grievances in conference, a provision considered to carry over into § 3 First (i). The latter requires that disputes over grievances "shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes."

In accordance with this view "either party," within the further provision of § 3 First (i) authorizing reference of the dispute to the Adjustment Board "by petition of the parties or by either party," refers to the carrier or the collective agent, not to the aggrieved employee acting otherwise than by the collective agent. Hence, "parties" as used in § 3 First (j) is given similar meaning. Consequently the collective agent also has exclusive power to submit the dispute to the Board and to represent aggrieved employees before it.

Petitioner's view has been adopted, apparently, in the general practice, if not the formally declared policy of the Adjustment Board. And this, it seems, has been due to the position taken consistently by the employees' representatives on the Board, over the opposition of carrier

representatives.[29]   The unions, apparently, like petitioner in this case, interpret the Act as not contemplating two distinct systems for the settlement of disputes, one wholly collective for major disputes, the other wholly individual for minor ones.   In this view the collective agent becomes a party to the collective agreement by making it, and its interest as representative of the collective interest does not cease when that function ends.   It remains a party to the agreement, as such representative, after it is made; and consequently, in that capacity and for the protection of the collective interest, is concerned with the manner in which the agreement may be interpreted and applied.

Accordingly, petitioner urges that the statute, both by its terms and by its purpose, confers upon the collective agent the same exclusive power to deal with grievances, whether by negotiation and contract, or by presentation to the Board when agreement fails, as is given with respect to major disputes.   And the aggrieved employee's rights of individual action are limited to rights of hearing before the union and possibly also by the carrier.

We think that such a view of the statute's effects, in so far as it would deprive the aggrieved employee of effective voice in any settlement and of individual hearing before the Board, would be contrary to the clear import of its provisions and to its policy.

It would be difficult to believe that Congress intended, by the 1934 amendments, to submerge wholly the individual and minority interests, with all power to act concerning them, in the collective interest and agency, not only in forming the contracts which govern their employment relation,[30] but also in giving effect to them and to all other

[29] Cf. Administrative Procedure in Government Agencies, Sen. Doc. 10, Part IV, 77th Cong., 1st Sess., 7.

[30] Cf. *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192; *Tunstall* v. *Brotherhood of Locomotive Firemen*, 323 U. S. 210; *Wallace Corp.* v. *Labor Board*, 323 U. S. 248.

incidents of that relation. Acceptance of such a view would require the clearest expression of purpose. For this would mean that Congress had nullified all preexisting rights of workers to act in relation to their employment, including perhaps even the fundamental right to consult with one's employer, except as the collective agent might permit. Apart from questions of validity, the conclusion that Congress intended such consequences could be accepted only if it were clear that no other construction would achieve the statutory aims.[31]

The Act's provisions do not require such a construction. On the contrary they appear expressly to preclude it. The proviso to § 2 Fourth in terms reserves the right of "an employee *individually*" to confer with management; and § 3 First (j) not only requires the Board to give "due notice of all hearings *to the employee* . . . involved in any dispute *submitted* . . .," but provides for "parties" to be heard "either *in person,* by counsel, or by other representatives, as they may respectively elect."

These provisions would be inapposite if the collective agent, normally a labor union and an unincorporated association, exclusively were contemplated. Such organizations do not and cannot appear and be heard "in person." Nor would the provision for notice "to *the employee* . . . involved in any dispute" be either appropriate or necessary. If only the collective representative were given

---

[31] In this connection it is important to recall that the Act does not contemplate the existence of closed shops, to the extent at any rate that the carrier is forbidden to make such agreements. Cf. § 2 Fourth; 78 Cong. Rec. 12,402; 40 Op. Atty. Gen., No. 59 (Dec. 29, 1942). Accordingly the interests of unorganized workers and members of minority unions are concerned in the solution. These are not always adverse to the interests of the majority or of the designated union. But they may be so or even hostile. Cf. the authorities cited in note 30. To regard the statute as so completely depriving persons thus situated of voice in affairs affecting their very means of livelihood would raise very serious questions.

rights of submission, notice, appearance and representation, language more aptly designed so to limit those rights was readily available and was essential for the purpose.

This conclusion accords fully with the terms of the proviso to § 2 Fourth. It appears to be intended as a qualification, in respect to loss of time and free transportation, of the section's preceding prohibitions against the carrier's giving financial and other aid to labor organizations and to employees in an effort to influence their union affiliations.[32] However, the language clearly contemplates also that the individual employee's right to confer with the management about his own grievance is preserved. There is some indication in the legislative history to this effect.[33] The right is so fundamental that we do not believe the purpose was to destroy it. Cf. 40 Op. Atty. Gen., No. 59, pp. 5, 6 (Dec. 29, 1942); *Hughes Tool Co.* v. *Labor Board,* 147 F. 2d 69.

Rights of conference are not identical with rights of settlement. But the purpose of conference and the duty to treat is to bring about agreement. The right and the obligation to share in the negotiations are relevant to their aim. Conceivably the statute might confer the right to participate in the negotiations, that is, to be heard before any agreement is concluded, either upon the collective agent or upon the aggrieved employee or employees, at the same time conferring upon the other the final voice in determining the terms of the settlement. This is, in effect, the position taken by each of the parties in this case. But they differ concerning where the final say has been

[32] This undoubtedly was the primary object. The language in the concluding clause, "while engaged in the business of a labor organization," applies literally only to employees travelling upon union business, and has no apparent application to the preceding provision relating to the individual employee's right to confer with management.

[33] Hearings before Committee on Interstate Commerce on H. R. 7650, 73d Cong., 2d Sess., 36, 44, 89.

vested. Petitioner maintains it has been given to the union. Respondents say it has been left with them.

In the view we take the Act guarantees to the aggrieved employee more than merely the right to be heard by the union and the carrier. We cannot say that the terms of the proviso to § 2 Fourth and of § 3 First (j) are so limited. Moreover, § 3 First (p) expressly states that the statutory suit to enforce an award in favor of an aggrieved employee may be brought by "the petitioner," presumably the collective agent or by the employee. All of these provisions contemplate effective participation in the statutory procedures by the aggrieved employee.

His rights, to share in the negotiations, to be heard before the Board, to have notice, and to bring the enforcement suit, would become rights more of shadow than of substance if the union, by coming to agreement with the carrier, could foreclose his claim altogether at the threshold of the statutory procedure. This would be true in any case where the employee's ideas of appropriate settlement might differ from the union's. But the drastic effects in curtailment of his preexisting rights to act in such matters for his own protection would be most obvious in two types of cases: one, where the grievance arises from incidents of the employment not covered by a collective agreement, in which presumably the collective interest would be affected only remotely, if at all; the other, where the interest of an employee not a member of the union and the collective interest, or that of the union itself, are opposed or hostile. That the statute does not purport to discriminate between these and other cases furnishes strong support for believing its purpose was not to vest final and exclusive power of settlement in the collective agent.[34]

---

[34] Cf. note 37 and text. It is to be doubted that Congress by the generally inclusive language used concerning grievances intended, for instance, to give the collective agent exclusive power to settle a

We need not determine in this case whether Congress intended to leave the settlement of grievances altogether to the individual workers, excluding the collective agent entirely except as they may specifically authorize it to act for them, or intended it also to have voice in the settlement as representative of the collective interest. Cf. *Matter of Hughes Tool Co.*, 56 N. L. R. B. 981, modified and enforced, *Hughes Tool Co.* v. *Labor Board, supra.* The statute does not expressly exclude grievances from the collective agent's duty to treat or power to submit to the Board. Both collective and individual interests may be concerned in the settlement where, as in this case, the dispute concerns all members alike, and settlement hangs exclusively upon a single common issue or cause of dispute arising from the terms of a collective agreement.[35]

grievance arising independently of the collective agreement, affecting only nonunion men to whose claim the union and the majority were hostile.

[35] But whether or not the carrier's violation affects all the members of the group immediately and alike, so as to create a present basis for claims by each, the violation, though resulting from misinterpretation, would constitute a present threat to the similar rights of all covered by the contract. Cf. *Hughes Tool Co.* v. *Labor Board, supra*, 72, 74; 40 Op. Atty. Gen., No. 59, pp. 4, 5 (Dec. 29, 1942).

To leave settlements in such cases ultimately to the several choices of the members, each according to his own desire without regard to the effect upon the collective interest, would mean that each affected worker would have the right to choose his own terms and to determine the meaning and effect of the collective agreement for himself. Necessarily, the carrier would be free to join with him in doing so and thus to bargain with each employee for whatever terms its economic power, pitted against his own, might induce him to accept. The result necessarily would be to make the agreement effective, not to all alike, but according to whatever varied interpretations individual workers, from equally varied motivations, might be willing to accept. To give the collective agent power to make the agreement, but exclude it from any voice whatever in its interpretation would go far toward destroying its uniform application.

Those interests combine in almost infinite variety of relative importance in relation to particular grievances, from situations in which the two are hostile or in which they bear little or no relation of substance to each other and opposed to others in which they are identified.[36]

Congress made no effort to deal specifically with these variations.[37] But whether or not the collective agent has rights, independently of the aggrieved employee's authorization, to act as representative of the collective interest and for its protection in any settlement, whether by agreement or in proceedings before the Board, an award cannot be effective as against the aggrieved employee unless he is represented individually in the proceedings in accordance with the rights of notice and appearance or representation given to him by § 3 First (j). Those rights are separate and distinct from any the collective agent may have to represent the collective interest. For an award to affect the employee's rights, therefore, more must be shown than that the collective agent appeared and purported to act for him. It must appear that in some legally sufficient way he authorized it to act in his behalf.[38]

[36] Depending upon the substantive character of the claim, its foundation in a collective agreement or otherwise, its intrinsically substantial or insubstantial nature, the number of employees affected, the length of time it remains unsettled, the number of claims allowed so to run, or perhaps other factors, the grievance may be a matter of large moment to the group as a whole or of little or no concern to it and, it may be, of either identical or converse importance to the individual or individuals directly affected.

[37] Congress was concerned primarily with differences between the carrier and the employees, not with differences among the latter or between them, or some of them, and the collective agent. The statute therefore was not drawn with an eye levelled to these problems, except as to choice of representatives, cf. § 2 Fourth; § 2 Ninth; and note 34.

[38] Authority might be conferred in whatever ways would be sufficient according to generally accepted or "common law" rules for the creation of an agency, as conceivably by specific authorization given

Petitioner's contrary view, as has been indicated, regards the settlement of grievances as part of the collective bargaining power, indistinguishable from the making of collective agreements. The assumption ignores the major difference which the Act has drawn between those functions, both in defining them and in the modes provided for settlement.

To settle for the future alone, without reference to or effect upon the past, is in fact to bargain collectively, that is, to make a collective agreement. That authority is conferred independently of the power to deal with grievances, as part of the power to contract "concerning rates of pay, rules, or working conditions." It includes the power to make a new agreement settling for the future a dispute concerning the coverage or meaning of a preexisting collective agreement. For the collective bargaining power is not exhausted by being once exercised; it covers changing the terms of an existing agreement as well as making one in the first place.

But it does not cover changing them with retroactive effects upon accrued rights or claims. For it is precisely the difference between making settlements effective only for the future and making them effective retroactively to conclude rights claimed as having already accrued which marks the statutory boundary between collective bargaining and the settlement of grievances. The latter by explicit definition includes the "interpretation or application" of existing agreements. To regard this as part of the collective bargaining power identifies it with making new agreements having only prospective operation; and

---

orally or in writing to settle each grievance, by general authority given to settle such grievances as might arise, or by assenting to such authority by becoming a member of a union and thereby accepting a provision in its constitution or rules authorizing it to make such settlements.

by so doing obliberates the statute's basic distinction between those functions.[39]

The Brotherhood had power, therefore, as collective agent to make an agreement with the carrier, effective for the future only, to settle the question of starting time, and that power was derived from the Act itself. In dealing within its scope, the carrier was not required to look further than the Act's provisions to ascertain the union's authority. But it does not follow, as petitioner assumes, that it had the same right to deal with the union concerning the past. That aspect of the dispute was not part of the collective agent's exclusive statutory authority.

If to exclude it severs what otherwise might be considered organic, the severance clearly is one which Congress could make and is one we think it has made, by its definition of grievances and by the provisions for individual participation in their settlement. If, moreover, as petitioner urges, this may make the settlement less convenient than if power to deal with grievances were vested exclu-

---

[39] The distinction holds true although "interpretation or application" may look to the future as well as the past, as it often does. It goes to the source of the right asserted, whether in an antecedent agreement or only to one presently sought. The difference is important for other issues as well as those presently involved, e. g., application of statutes of limitations.

The distinction is not to be ignored or wiped out merely because a particular dispute or agreement may look both to the past and to the future. The special procedure for settling grievances was created because it was intended they should be disposed of differently from disputes over "rates of pay, rules, or working conditions," which were committed exclusively to the collective agent's authority. One important difference preserved the aggrieved employee's rights to participate in all stages of the settlement. Congress therefore, when it preserved those rights, contemplated something more than collective representation and action to make the 'settlement effective for the past. It follows that the individual employee's rights cannot be nullified merely by agreement between the carrier and the union. They are statutory rights, which he may exercise independently or authorize the union to exercise in his behalf.

sively in the collective agent, that consequence may be admitted. But it cannot outweigh the considerations of equal or greater force which we think Congress has taken into account in preserving the individual workman's right to have a voice amounting to more than mere protest in the settlement of claims arising out of his employment.

From the fact that the Brotherhood occupied the position of collective bargaining agent and as such had power to deal for the future, therefore, petitioner was not entitled to make any assumption concerning its authority to settle the claims accrued for the past or to represent the claimants exclusively in proceedings before the Board. Accordingly for the union to act in their behalf with conclusive effect, authorization by them over and above any authority given by the statute was essential.

## III

Petitioner urges that, apart from the statute, the facts of record show as a matter of law that respondents authorized the Brotherhood to settle the claims, to submit them to the Board, and to represent them in its proceedings. Respondents deny that authority in any of these respects was given, either by individual authorization or by virtue of the Brotherhood's constitution and rules; and they insist that the record presents these questions as issues of fact.

Stripped of its statutory influences, petitioner's argument comes in substance to this. It is undisputed that from August 27, 1934, to November 23, 1936, when the complaint in Docket No. 3537 was filed, respondents made out time slips and filed many complaints with the carrier's local officials through local officers of the Brotherhood on account of departures from the schedule of Article 6. The question of the article's applicability was a matter of discussion between the Brotherhood and company officials from the time of the transfer in 1934. Respondents admit

having authorized the Brotherhood, at a meeting of their local lodge, to file the complaint in Docket No. 3537 and that this complaint was filed in full compliance with the Brotherhood's constitution and rules. The settlement of October, 1938, and the consequent withdrawal of the claim in Docket No. 3537 were made by the same official, Williams, whom respondents had authorized to file the claim and with whom, in effect, both the collective agreement and the Brotherhood's regulations required petitioner to deal concerning the matter.[40] Moreover, the complaint in Docket No. 7324, filed in May, 1939, was filed by Williams and in the same manner as the complaint in Docket No. 3537.

From these facts petitioner concludes that respondents authorized the Brotherhood to settle the claims and to represent them before the Board. In its view, all of these transactions related to the same subject matter, namely, whether Article 6 was applicable in the Whiting yard, the only difference being that the relief sought in the two proceedings was not the same; and that difference is not material.

---

[40] The collective agreement, of which Article 6 is a part, provides: "Any controversy arising *as to the application* of the rules herein agreed upon . . . shall be taken up . . ." by the general grievance committee with the general superintendent of the carrier, "and in the event of their failure to agree upon a satisfactory settlement, the Committee may appeal to the Vice President." (Emphasis added.) Petitioner says this provision bound it to deal only with the general committee.

Petitioner also relies upon Rule 10 of the Brotherhood's constitution and general rules as imposing the same duty:

"Whatever action may be taken by the General Grievance Committee or Board of Adjustment of any system within the meaning of the above General Rules shall be law to the Lodges on that road until and unless reversed by the Board of Appeals, and if any member refuses to vote or abide by the action of such General Grievance Committee or Board of Adjustment, he shall be expelled from the Brotherhood for violation of obligation."

See also note 8.

Respondents differ concerning the effect of these facts and others they set forth. They allege that under the Brotherhood's constitution and rules neither Williams and Johnson nor the general grievance committee could "revise or change a general wage 'schedule' or agreement concerning rates of pay, nor working conditions, unless authorized to do so by a majority vote of the lodges, or by a majority vote of the membership in the system"; that claims of individual members for back compensation could not be released without specific authority given individually; that no such authority was given; and that the carrier had knowledge of these limitations. They further allege that Williams and Johnson failed to notify them of the settlement, as the by-laws required; [41] and deny that they knew of the settlement, the proceedings in Docket 7324 or the award until after the award was made, when they promptly repudiated it.[42] They say accordingly that Williams acted without authority from them directly or through the Brotherhood's regulations in submitting and presenting the claims; and that the award is invalid not only for this reason but also because no notice of the proceeding was given to them.

It is apparent that the parties are at odds upon the inferences to be drawn from the facts and their legal effects rather than upon the facts themselves. Respondents deny, and petitioner apparently does not claim, that they at any time individually and specifically authorized the Brotherhood or its officials to compromise their claims for money due or to act for them exclusively in Board proceedings concerning those claims. If there is an issue

[41] This, they say, was because Williams did not regard the agreement as waiving the money claims, since he did not give them the required notice and shortly after the settlement filed the money claims with the Board. Cf. note 6.

[42] Respondents also attack the settlement because it was not signed by the third member of the grievance committee, the local grievance chairman. This objection borders on the frivolous.

in this respect it is obviously one of fact concerning which evidence and findings would be required.

The real issues, as we view the record, come down to whether respondents assented, in legal effect, to the final settlement of their claims by the union or to exclusive representation by it in any of the following ways: (1) by making complaints through local union officials; (2) by authorizing the Brotherhood to submit the complaint in Docket No. 3537; (3) by virtue of the Brotherhood's regulations; (4) by virtue of the collective agreement.

The collective agreement could not be effective to deprive the employees of their individual rights. Otherwise those rights would be brought within the collective bargaining power by a mere exercise of that power, contrary to the purport and effect of the Act as excepting them from its scope and reserving them to the individuals aggrieved. In view of that reservation the Act clearly does not contemplate that the rights saved may be nullified merely by agreement between the carrier and the union.

Nor can we say as a matter of law that the mere making of complaints through local Brotherhood officials amounted to final authorization to the union to settle the claims or represent the employees before the Board. Neither the statute nor the union's regulations purported to give these effects to that conduct. The time slips apparently were filed by the employees themselves. The record shows only the general fact that complaints concerning departures were made through local officials. More than this would be required to disclose unequivocal intention to surrender the individual's right to participate in the settlement and to give the union final voice in making it together with exclusive power to represent him before the Board. The making of complaints in this manner was only preliminary to negotiation and equivocal at the most.

Nor can we say, in the present state of the record, that the union's regulations unequivocally authorized the gen-

eral grievance committee or its chairman either to settle the claims or to act as exclusive representative before the Board. The parties rely upon apparently conflicting provisions or, if they are not actually in conflict, then upon different ones, the applicability of some of which is in dispute. Thus respondents rely upon Rule 3, which forbids change in existing agreements without the required vote of local lodges or system membership, and petitioner says the rule is not applicable to the dispute in this case. Whether or not the rule is applicable is a question of fact to be determined in the light of whatever evidence may be presented to sustain the one view or the other. Conceivably it may be intended to apply only where no grievance is involved or to the settlement of grievances and other disputes as well. But we cannot say, in the absence of further light than is now available, that on its face the rule bears only the one construction or the other.

Similar difficulties arise in connection with the other regulations. Only some of them are set forth in the printed record, although the full constitution and rules were made a part of the record proper by petitioner. The rules and regulations do not purport to require members to negotiate and settle their grievances only through the union. The general committee can act only when a grievance is referred to it by a local lodge. The rules are extensive, parts of them appear to involve possible conflict, the parties differ concerning their effects, and the mode of their operation quite obviously may be largely affected by the manner in which they are applied in practice. Their construction and legal effect are matters of some complexity and should not be undertaken in a vacuum apart from the facts relating to their application in practice. Because both factual and legal inferences would be involved in determining the effects of the regulations to bring about a surrender of the individual rights to take part in the settlement and in the Board's proceedings,

those effects cannot be determined as a matter of law in the first instance here.

Nor can we say as a matter of law that authorizing the submission in Docket No. 3537, without more, constituted authorization either to make the agreement of settlement or to represent the employees in Docket No. 7324. The matter requires some explication in the light of the view we have taken concerning the rights of an aggrieved employee in the settlement of grievances. In that view no valid settlement can be made unless he agrees. If settlement by agreement after negotiation fails, he has the right to submit the dispute to the Board for decision. If it is submitted he has rights of notice, hearing and individual representation according to his choice.

All these rights are separate and distinct, though closely related. A surrender or delegation of one would not result in surrender of the others as a matter of law or necessarily as a matter of fact. Whether in particular circumstances it might do so would depend upon whether they were considered sufficient to disclose such an intent.[43] It follows that authority to concur in an agreement of settlement does not imply without more authority to represent the employee in Board proceedings, or the latter the former. This is true when the authority is given to the collective agent as it is when it is given to another. That circumstance is not controlling. It only bears as one fac-

---

[43] In other words, the aggrieved employee has the right to delegate his power to concur in an agreement of settlement, but at the same time to reserve his rights to make submission to the Board and of appearance and representation before it, or conversely to reserve his right to concur and delegate the rights of submission and representation. To what extent he may delegate one or all depends therefore upon the intent with which he makes the particular delegation as disclosed by the circumstances in which it is made, or gives evidence of such intent by his conduct, and this will be a question of fact unless the circumstances so clearly show he intended to make the delegation claimed that no other conclusion is possible.

tor in the total situation. Accordingly in this case the mere fact that the respondents authorized the union to make the submission and to represent them in Docket No. 3537 did not imply authority to make the settlement agreement or to represent them in the quite different later proceedings in Docket No. 7324.

The record does not show conclusively that prior to the submission in Docket No. 3537 the employees had finally committed the whole matter of their claims into the union's hands in such a manner as to constitute a surrender of their individual rights to concur in any agreement of settlement. That conclusion is not justified merely from the fact that the union participated in negotiations with the carrier.

Moreover, the authorization, to act in Docket No. 3537, obviously was given after efforts to secure settlement by negotiation and agreement were considered to have failed. Only then was anyone entitled to make the submission. Accordingly that authorization was entirely consistent with the idea that no further negotiations would be had, and therefore, without more, also with the idea that no authority to negotiate further was implied. It may be that upon a full hearing concerning the course and scope of the negotiations prior to this submission, the evidence will justify a conclusion that the respondents had authorized the union to act finally for them. But the record in its present state does not justify that conclusion as a matter of law.[44]

---

[44] It is true that respondents' position concerning the consequences of their authorization to make the submission in Docket No. 3537 is not altogether consistent. For in claiming that they authorized submission only to determine the applicability of Article 6 for the future, and not to determine the question of retroactivity so as to establish or conclude adversely the basis for their individual monetary claims, they appear to ignore, as does petitioner in some of its contentions, the distinction between collective bargaining and the settlement of grievances as the Act defines them. Cf. note 39 and text. If their

It may be true also that if Docket No. 3537 had been carried to decision the award would have been effective to determine the rights of the parties. But no award was made in that proceeding. It was terminated and the claim was withdrawn. Whether or not that action or other events occurring later were effective to terminate the authority given to submit for the Board's determination the issue which was the foundation of respondents' monetary claims or whether that authority continued in spite of the changed conditions are questions also to be determined from a factual evaluation of the entire situation, essentially preliminary to determination of legal effects, which we cannot make.

Since upon the total situation we cannot say as a matter of law that respondents had authorized the Brotherhood to act for them in Docket No. 7324, whether in submitting the cause or in representing them before the Board; since it is conceded also that they were not given notice of the proceedings otherwise than as the union had knowledge of them; and since further they have denied that they had knowledge of the proceedings and of the award until after it was entered, the question whether the award was effective in any manner to affect their rights must be determined in the further proceedings which are required. The crucial issue in this respect, of course, will be initially whether respondents had authorized the Brotherhood in any legally sufficient manner to represent them, individually, in the Board's proceedings in Docket No. 7324.

purpose was merely to authorize settlement for the future, without retroactive effects, the submission to the Adjustment Board was misconceived, since it has no power to render a decision requiring the carrier or the union to make a new agreement. Its only authority, under the Act, is to determine what they have agreed upon previously or, outside the scope of a collective agreement, what rights the carrier and its employees may have acquired by virtue of other incidents of the employment relation. Such an issue by its very nature looks to the past, though it may also seek compliance for the future.

Until that question is determined, it is not necessary for us to pass upon the important issue concerning the finality and conclusive effect of the award, or to determine the validity and legal effect of the compromise agreement. We accordingly express no opinion concerning those issues.

The judgment is affirmed. The cause is remanded for further proceedings in conformity with this opinion.

Mr. Justice Frankfurter, dissenting.

On July 27, 1934, the Brotherhood of Railroad Trainmen made an agreement with petitioner, Elgin, Joliet and Eastern Railway Company, affecting its yardmen whereby the starting time for switching crews was fixed. The respondents are employed as switching crews in the Whiting, Indiana yard of petitioner. They are all members of the Brotherhood. Observance by petitioner of this yard agreement was called into question. After abortive conferences for the adjustment of these claims between officials of petitioner and of the Brotherhood, C. H. Williams, General Chairman of the Brotherhood General Grievance Committee, filed a complaint covering several grievances with the National Railroad Adjustment Board, created by the Railway Labor Act of 1934, 48 Stat. 1185, 45 U. S. C. § 151 *et seq.*, to compel petitioner's compliance with the agreed time. In November, 1936, the cases were duly docketed. Before they came to be heard, petitioner, on October 28, 1938, proposed settlement of numerous claims against it by the Brotherhood then pending before the Adjustment Board. Among these claims was the dispute as to starting time. Petitioner agreed for a ninety-day trial period, beginning November 15, 1938, to abide by the time fixed in the 1934 agreement. But its offer was conditioned "on a complete settlement and withdrawal of all cases now pending either before the board, or under discussion with this office . . . and it is further under-

stood that in the event these settlements are accepted that the claims listed in this letter cover all claims of a similar nature, and that no other claims covering the same or like situations will be presented when such claims arise from causes occurring prior to the date of this settlement." On October 31, 1938, settlement on these terms was accepted for the yardmen by Williams, General Chairman, and S. F. Johnson, the Secretary of the Brotherhood's General Grievance Committee. On the same day and upon request of the Brotherhood and Railway, the cases were removed from its docket by the Adjustment Board.

Later the Brotherhood filed with the Adjustment Board a second complaint claiming money damages on behalf of its members for violation of the 1934 agreement. The Board, by formal award, denied the claim on the ground that the "evidence shows that the parties to the agreement disposed of the claim here made by the letter of carrier dated October 28th, 1938, accepted by employes October 31, 1938."

Respondents then filed this suit in the District Court for damages. Petitioner invoked the 1938 settlement and the Board's award thereon as a bar, and moved for summary judgment. Respondents resisted this motion by denying the authority of the Brotherhood officials to present their claims to the Board or to agree to the settlement. The District Court gave summary judgment for the petitioner which was reversed by the Circuit Court of Appeals for the Seventh Circuit on the ground that the question of authority of the Brotherhood officials raised an issue of fact for trial by the District Court. 140 F. 2d 488. The correctness of this ruling is the important question now before us. 323 U. S. 690.

We have had recent occasion to consider the Railway Labor Act in other aspects. *Switchmen's Union* v. *Board,* 320 U. S. 297; *General Committee* v. *M.-K.-T. R. Co.,* 320 U. S. 323; *General Committee* v. *Southern Pacific Co.,*

320 U. S. 338. The complexities which the problems in those cases laid bare, make clear that the specific question immediately before us cannot be isolated from the scheme and structure of the Railway Labor Act as an entirety. The Act in turn cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve.

From the point of view of industrial relations our railroads are largely a thing apart. The nature and history of the industry, the experience with unionization of the roads, the concentration of authority on both sides of the industry in negotiating collective agreements, the intimacy of relationship between the leaders of the two parties shaped by a long course of national, or at least regional, negotiations, the intricate technical aspects of these agreements and the specialized knowledge for which their interpretation and application call, the practical interdependence of seemingly separate collective agreements—these and similar considerations admonish against mutilating the comprehensive and complicated system governing railroad industrial relations by episodic utilization of inapposite judicial remedies.

The Railway Labor Act of 1934 is primarily an instrument of government. As such, the view that is held of the particular world for which the Act was designed will largely guide the direction of judicial interpretation of the Act. The railroad world for which the Railway Labor Act was designed has thus been summarized by one of the most discerning students of railroad labor relations: "The railroad world is like a state within a state. Its population of some three million, if we include the families of workers, has its own customs and its own vocabulary, and lives according to rules of its own making. . . . This state within a state has enjoyed a high degree of internal peace for two generations; despite the divergent interests of its component parts, the reign of law has been firmly

established." Garrison, The Railroad Adjustment Board: A Unique Administrative Agency (1937) 46 Yale L. J. 567, 568–69.

The Railway Labor Act of 1934 is an expression of that "reign of law" and provides the means for maintaining it. Nearly half a century of experimental legislation lies behind the Act. It is fair to say that every stage in the evolution of this railroad labor code was progressively infused with the purpose of securing self-adjustment between the effectively organized railroads and the equally effective railroad unions and, to that end, of establishing facilities for such self-adjustment by the railroad community of its own industrial controversies. These were certainly not expected to be solved by ill-adapted judicial interferences, escape from which was indeed one of the driving motives in establishing specialized machinery of mediation and arbitration. Government intervention of any kind was contemplated only as a last resort for the avoidance of calamitous strikes.

The landmarks in this history, tersely summarized, are the meager act of October 1, 1888, 25 Stat. 501, providing for voluntary arbitration; the Erdman Act of June 1, 1898, 30 Stat. 424, securing government mediation and arbitration, but applicable only to those actually engaged in train service operations; the Newlands Act of July 15, 1913, 38 Stat. 103, providing for a permanent board of mediation and also a board of arbitration; the Adamson Act of September 3, 1916, 39 Stat. 721, as to which see *Wilson* v. *New*, 243 U. S. 332; Order No. 8 of February 21, 1918, formulating the labor policy of the Government after the United States took over the railroads, see Hines, War History of American Railroads (1928), p. 155 *et seq.;* the more elaborate machinery established by Title III of the Transportation Act of 1920, 41 Stat. 456, 469, for adjustments of these controversies, which in its turn was repealed and replaced by the Railway Labor Act of May

20, 1926, 44 Stat. 577, legislation agreed upon between the railroads and the Brotherhoods and probably unique in having been frankly accepted as such by the President and Congress.[1] The actual operation of this legislation partly disappointed the hopes of its sponsors, and led, for the still greater promotion of self-government by the railroad industry, to the Act of 1934.

The assumption as well as the aim of that Act is a process of permanent conference and negotiation between the carriers on the one hand and the employees through their unions on the other. Section 2, First, provides "It shall be the duty of all carriers.... and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise . . ." Section 2, Second, provides "All disputes between a carrier . . . and its . . . employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier . . . and by the employees thereof interested in the dispute." According to § 2, Sixth, "In case of a dispute . . . arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, it shall be the duty of the designated representative or representatives of such carrier . . . and of such employees, within ten days after the receipt of notice of a desire on the part of either party to confer in respect to such dispute, to specify a time and place at which such

---

[1] In his message of December 8, 1925, to Congress, President Coolidge stated: "I am informed that the railroad managers and their employees have reached a substantial agreement as to what legislation is necessary to regulate and improve their relationship. Whenever they bring forward such proposals, which seem sufficient also to protect the interests of the public, they should be enacted into law." 67 Cong. Rec. 463.

conference shall be held . . ." Section 3, First (i) directs that disputes growing out of grievances or the interpretation or application of agreements concerning rates of pay, rules, or working conditions be handled by conference and negotiation, including resort if necessary to the chief operating officer of the carrier. Compliance with these statutory duties is a prerequisite to appeal to the National Railroad Adjustment Board. The purpose of this legislation is the exertion of maximum pressure toward amicable settlement between the parties. Resort to the Adjustment Board is the last step in the statutory process.

In the controversy before us an amicable adjustment between the parties—the goal of the legislation—had been achieved by pursuing the course which the Act of 1934 directed. We are now asked to nullify this settlement, arrived at after prolonged negotiations, and to open the door of litigation to new discords. Not only is it sought to revive the dispute and to restore it to the status it had before the Adjustment Board more than eight years ago. The respondents claim that after all these years they have a right to repudiate their bargaining agents and to try the authority of these agents as though this were a conventional lawsuit involving the responsibility of a principal for the conduct of his agent.

As members of their Brotherhood, respondents were of course familiar with the procedure whereby the union speaks for them both to the Railroad and before the Adjustment Board. The Brotherhood's "Constitution and General Rules," which the respondents made part of their case below, are clear about this. Rule No. 7 declares that, after a grievance has been transmitted to a General Grievance Committee, that Committee "shall have power to alter, amend, add to or strike out . . . any part or all of any complaint or claim submitted to the committee, subject to appeal to the entire General Committee and/or Board of Appeals. A general grievance Committee may

authorize their chairman to handle all grievances received from local lodges with the management for settlement . . ." Respondents cannot deny that the Brotherhood officials had authority to seek compliance by the railroad with the starting time agreement through the Adjustment Board. In view of the sweeping power of the General Grievance Committee to settle grievances, the settlement that was made on behalf of the Brotherhood is invulnerable. The attack on the settlement because it was signed by only two of the three members of the Committee is frivolous. Such procedure is not at all unusual. Williams and Johnson settled other grievances in like manner, many of them involving claims for money. The Brotherhood's own rules sanction such action in that the Committee may authorize the Chairman to handle all grievances.

This is not a simple little case about an agent's authority. Demands of the employees' representative imply not only authority from those for whom he speaks but the duty of respect from those to whom he speaks. The carrier is under a legal duty to treat with the union's representative for the purposes of the Railway Labor Act. Section 2, Ninth; see *Virginian R. Co.* v. *System Federation,* 300 U. S. 515. We do not have the ordinary case where a third person dealing with an ostensible agent must at his peril ascertain the agent's authority. In such a situation a person may protect himself by refusing to deal. Here petitioner has a duty to deal. If petitioner refuses to deal with the officials of the employees' union by challenging their authority, it does so under pain of penalty. If it deals with them on the reasonable belief that the grievance officials of the Brotherhood are acting in accordance with customary union procedure, settlements thus made ought not to be at the hazard of being jettisoned by future litigation. To allow such settlements to be thus set aside is to obstruct the smooth

working of the Act. It undermines the confidence so indispensable to adjustment by negotiation, which is the vital object of the Act. See *Division 525, Order of Railway Conductors* v. *Gorman,* 133 F. 2d 273, 278.

But respondents claim that irrespective of the authority of the Brotherhood officials to handle claims for the enforcement of the agreed starting time, Williams did not have authority to present to the Adjustment Board the claim for damages due to respondents for petitioner's alleged past violation of the starting-time agreement. They insist that there is no relation between a claim for money resulting from the violation of a collective agreement and a claim for the enforcement of a collective agreement. But surely this is to sever that which is organic. It wholly disregards the nature of such a collective agreement, its implications and its ramifications. In passing on the claim for money damages arising out of the yard agreement, any tribunal would have to examine, interpret and apply the collective agreement precisely as it would if the issue were the duty to observe the agreement in the future. An award based on the application of the collective agreement would, quite apart from technical questions of *res judicata,* affect future claims governed by the same collective agreement whatever the particular forms in which the claims may be cast. To find here merely an isolated, narrow question of law as to past liability is to disregard the ties which bind the money controversy to its railroad environment. Such a view is blind to the fact that "all members of the class or craft to which an aggrieved employee belongs have a real and legitimate interest in the dispute. Each of them, at some later time, may be involved in a similar dispute." 40 Ops. Atty. Gen., No. 59 (Dec. 29, 1942) pp. 4–5. Indeed, such a view leaves out of consideration not only the significant bearing of the construction of the same collective agreement on parts of the carrier's lines not immediately before the Court. It

overlooks the relation of a provision in a collective agreement with one railroad to comparable provisions of collective agreements with other roads.

To allow the issue of authorization after an award by the Board to be relitigated in the courts is inimical to the internal government of the Brotherhood. Union membership generates complicated relations. Policy counsels against judicial intrusion upon these relations. If resort to courts is at all available, it certainly should not disregard and displace the arrangements which the members of the organization voluntarily establish for their reciprocal interests and by which they bound themselves to be governed. The rights and duties of membership are governed by the rules of the Brotherhood. Rule 10 concerns objections to official action: "Whatever action may be taken by the general grievance committee . . . shall be law to the lodges on that road until the next meeting of the board of appeals, and if any member refuses to vote or abide by the action of such general grievance committee or board of adjustment he shall be expelled from the Brotherhood for violation of obligation." To ask courts to adjudicate the meaning of the Brotherhood rules and customs without preliminary resort to remedial proceedings within the Brotherhood is to encourage influences of disruption within the union instead of fostering these unions as stabilizing forces. Rules of fraternal organizations, with all the customs and assumptions that give them life, cannot be treated as though they were ordinary legal documents of settled meaning. "Freedom of litigation, for instance, is hardly so essential a part of the democratic process that the courts should be asked to strike down all hindrances to its pursuit. The courts are as wise, to take an example of this, in adhering to the general requirement that all available remedies within the union be exhausted before redress is sought before them as they are unwise in many of the exceptions they have grafted upon

this rule." Witmer, Civil Liberties and the Trade Union (1941) 50 Yale L. J. 621, 630. To an increasing extent, courts require dissidents within a union to seek interpretation of the organization's rules and to seek redress for grievances arising out of them before appropriate union tribunals. Compare *Norfolk & Western R. Co.* v. *Harris*, 260 Ky. 132, 84 S. W. 2d 69; *Agrippino* v. *Perrotti*, 270 Mass. 55, 169 N. E. 793; *Snay* v. *Lovely*, 276 Mass. 159, 176 N. E. 791; *Webb* v. *Chicago, R. I. & G. R. Co.*, 136 S. W. 2d 245.

The Railway Labor Act, as the product of long experience, is a complicated but carefully devised scheme for adjusting the relations between the two powerful groups constituting the railroad industry. It misconceives the legislation and mutilates its provisions to read into it common law notions for the settlement of private rights. If, when a dispute arises over the meaning of a collective agreement, the legally designated railroad bargaining unit cannot negotiate with the carrier without first obtaining the specific authorization of every individual member of the union who may be financially involved in the dispute, it not only weakens the union by encouraging divisive elements. It gravely handicaps the union in its power to bargain responsibly. That is not all. Not to allow the duly elected officers of an accredited union to speak for its membership in accordance with the terms of the internal government of the union and to permit any member of the union to pursue his own interest under a collective agreement undermines the very conception of a collective agreement. It reintroduces the destructive individualism in the relations between the railroads and their workers which it was the very purpose of the Railway Labor Act to eliminate. To allow every individual worker to base individual claims on his private notions of the scope and meaning of a collective agreement intended to lay down uniform standards for all those covered by the

collective agreement, is to permit juries and courts to make varying findings and give varying constructions to an agreement inevitably couched in words or phrases reflecting the habits, usage and understanding of the railroad industry. Thus will be introduced those dislocating differentiations for workers in the same craft which have always been among the most fertile provocations to friction, strife, and strike in the railroad world. The Railway Labor Act, one had supposed, would be construed so as to reduce and not to multiply these seeds of strife.

In order to avoid mischievous opportunities for the assertion of individual claims by shippers as against the common interest of uniformity in construing railroad tariffs, this Court so construed the Interstate Commerce Act in the famous *Abilene Cotton Oil* case, 204 U. S. 426, as to withdraw from the shipper the historic common law right to sue in the courts for charging unreasonable rates. It required resort to the Interstate Commerce Commission because not to do so would result in the impairment of the general purpose of that Act. It did so because even though theoretically this Court could ultimately review such adjudications imbedded in the various judicial judgments—if a shipper could go to a court in the first instance—there would be considerations of fact which this Court could not possibly disentangle so as to secure the necessary uniformity. The beneficent rule in the *Abilene Cotton Oil* case was evolved by reading the Interstate Commerce Act not as though it were a collection of abstract words, but by treating it as an instrument of government growing out of long experience with certain evils and addressed to their correction. Chief Justice White's opinion in that case was characterized by his successor, Chief Justice Taft, as a "conspicuous instance of his unusual and remarkable power and facility in statesmanlike interpretation of statute law." 257 U. S. xxv. The provisions of the Railway Labor Act do not even

necessitate such a creative act of adjudication as this Court in the *Abilene* case unanimously accomplished. The Railway Labor Act contains no embarrassing specific provision, as was true of § 22 of the Interstate Commerce Act, 24 Stat. 379, 387, calling for subordination to the main purpose of the legislation. The considerations making for harmonious adjustment of railroad industrial relations through the machinery designed by Congress in the Railway Labor Act are disregarded by allowing that machinery to be by-passed and by introducing dislocating differentiations through individual resort to the courts in the application of a collective agreement.

Since the claim before the Adjustment Board was for money, there remains the question whether its disposition was open to judicial review. The Railway Labor Act commands that the Board's "awards shall be final and binding upon both parties to the dispute, except insofar as they shall contain a money award." § 3, First (m). But the determination here in controversy does not "contain a money award" so as to be excepted from the final and binding effect given other awards. The obvious meaning of "money award" is an award directing the payment of money, not one denying payment. See *Berryman* v. *Pullman Co.,* 48 F. Supp. 542. We are pointed to no aids to construction that should withhold us from giving the familiar term "money award" any other than its ordinary meaning as something that awards money. This construction is confirmed by comparison with the provisions of the Interstate Commerce Act dealing with reparation orders. Since both Acts came out of the same Congressional Committees one finds, naturally enough, that the provisions for enforcement and review of the Adjustment Board's awards were based on those for reparation orders by the Interstate Commerce Commission. Compare Railway Labor Act, § 3, First (p) with Interstate Commerce Act, as amended by § 5 of the Hepburn Act, 34

Stat. 584, 590, 49 U. S. C. § 16 (1), (2). If a carrier fails to comply with a reparation order, as is true of non-compliance with an Adjustment Board award, the complainant may sue in court for enforcement; the Commission's order and findings and evidence then become *prima facie* evidence of the facts stated. But a denial of a money claim by the Interstate Commerce Commission bars the door to redress in the courts. *Baltimore & Ohio R. Co.* v. *Brady,* 288 U. S. 448; *I. C. C.* v. *United States,* 289 U. S. 385, 388; *Terminal Warehouse* v. *Pennsylvania R. Co.,* 297 U. S. 500, 507.

The Railway Labor Act precludes review of the Board's award; and, since authorization of the Brotherhood officials to make the settlement is not now open to judicial inquiry, the judgment calls for reversal.

The CHIEF JUSTICE, MR. JUSTICE ROBERTS and MR. JUSTICE JACKSON join in this dissent.