**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, DISTRICT LODGE NO. 19, an unincorporated labor organization, Appellee,**

v.

**SOO LINE RAILROAD COMPANY, a Minnesota corporation, Appellant.**

No. 86–5355.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1987.

Decided Nov. 12, 1987.

Rehearing En Banc Granted Jan. 13, 1988.*

---

* Opinion and judgment vacated.

ists' Union) in violation of the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188, until such time as the Soo Line complies with the notice and bargaining procedures set forth in the RLA.

The Soo Line contends on appeal that the district court did not have jurisdiction over the subject matter of the dispute between the Soo Line and the Union for the reason that the dispute between them was not a major dispute subject to the mandatory bargaining procedures of the RLA, but was rather a matter personal to each employee and did not concern rates of pay, rules or working conditions. Alternatively, the Soo Line argues that if there is a dispute within the meaning of the RLA, it is a minor dispute subject to resolution by the National Railroad Adjustment Board. In our view, the findings of the district court are not clearly erroneous, and its legal conclusions are correct. We thus affirm.

## FACTS

On February 19, 1985, the Soo Line acquired the core rail assets of the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee). On January 1, 1986, the Milwaukee was merged into the Soo Line system. On September 10, 1985, the Soo Line entered into an employee protective agreement with the Machinists' Union. The preamble of the agreement states:

The purpose of this agreement is to provide pursuant to 49 U.S.C. § 11347 of the Interstate Commerce Act, as amended, and the Milwaukee Restructuring Act, for joint and equitable arrangements *to protect the interest of Employees adversely affected by the acquisition; and to provide for expedited changes in services, facilities, operations, seniority and existing collective bargaining agreements* * * *. [Emphasis added.]

The agreement provides that existing collective bargaining agreements shall be preserved. It states that any employee of the merged railroad company laid off as a result of the acquisition of the Milwaukee is entitled to certain benefits from the Soo Line, including a severance allowance

Richard T. Conway, Washington, D.C., for appellant.

Roger A. Jensen, Minneapolis, Minn., for appellee.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.

HEANEY, Circuit Judge.

The Soo Line Railroad Company (Soo Line) appeals from a decision of the United States District Court for the District of Minnesota enjoining the Soo Line from entering into separation agreements with individual members of the International Association of Machinists and Aerospace Workers, District Lodge No. 19, (Machin-

which, depending on the employee's length of service, could exceed $38,000.

In December, 1985, the Soo Line decided to reduce the number of employees on its payroll. It offered voluntary separation pay plans to certain employees represented by unions other than the Machinists' Union. Under this plan, employees who accepted separation would receive $15,000 in severance pay and, if they were older than 60, would have their health and welfare benefits continued for a period of five years. To take advantage of the plan, each employee was required to:

Release all rights under labor protective conditions, including but not limited to, statutory, contract, or agreement labor protection and those conditions commonly referred to as Appendix B. * * * [R]esign and relinquish all rights of or claims to employment with the Soo Line Railroad * * * and release and discharge said railroad company, * * * parent or subsidiaries, from any and all claims of whatsoever kind and nature growing out of or in connection with said employment.

No negotiations were held with the unions representing these employees. Many employees accepted the separation plan and terminated their services with the Soo Line. The Machinists' Union learned of the program and questioned the Soo Line with respect to the applicability of the program to machinists. The Company said it was not applicable. Thereafter, eight machinists, all over sixty years of age, contacted the Soo Line asking to participate in the severance plan. Their requests were honored and, after signing the necessary releases, their services with the railroad were terminated. Each received a separation allowance of $15,000 and became eligible to continue to receive certain health benefits until age sixty-five.

When the Machinists' Union learned that the severance plan was being offered to some of its members, it objected. In response to the objection, the Soo Line and the Union negotiated, in March and April of 1986, in an effort to reach an acceptable separation agreement. The negotiations were unsuccessful. At no time prior to or during the series of meetings between the Soo Line and the Machinists' Union did the Soo Line issue a notice pursuant to section 6 of the RLA, 45 U.S.C. § 156, triggering the dispute resolution procedures of the RLA. The Soo Line thereafter announced its intention to solicit machinists pursuant to its own separation agreement containing essentially the same terms as the agreements signed by other machinists. The Machinists Union then filed this action seeking to restrain the Soo Line from entering into separation agreements with individual machinists.

The matter was submitted to the district court on affidavits, exhibits, and abbreviated oral testimony. The parties stipulated that the hearing on the preliminary injunction could be considered as the hearing for a permanent injunction. The district court held that the dispute between the parties was a major one. It reasoned that section 6 of the RLA

establishes a comprehensive series of bargaining procedures, complete with detailed timetables and provisions for notice, to be followed by employers and bargaining representatives in effecting changes in rates of pay, rules, and working conditions. 45 U.S.C. § 156. When employers wish to make changes in any regulated areas, the statute mandates written notice of the desired modification, after which conferences between management and labor take place, with the optional assistance of the National Mediation Board.

It then reviewed the cases which have defined the difference between major and minor disputes and found that the dispute between the parties was major. It stated:

[T]he Court is not called upon to review the status of either labor or management at the interstices of an agreement. Instead, the case presents fundamental issues of whether or not a person may even be an employee or a member of a union. We are not defining an interemployment relationship, but the fundamental nature of the employment relationship itself.

Both parties agree that there is no provision in the existing agreements between the Union and Soo Line allowing solicitation of individual union members or for individual lump-sum separation agreements. Under the *Elgin* definition and the decisions of the other courts which have faced the jurisdictional issue in the present context, this dispute is major, and this Court therefore has jurisdiction over it.

The court then went on to hold that individual agreements such as those proposed by the Soo Line are impermissible. In reaching its decision, it relied on *J.I. Case Co. v. National Labor Relations Board*, 321 U.S. 332, 337, 64 S.Ct. 576, 580, 88 L.Ed. 762 (1944), *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 345, 64 S.Ct. 582, 584, 88 L.Ed. 788 (1944), and on two district court cases, *Brotherhood of Railway Airline Clerks and Steamship Clerks v. Chesapeake and Ohio Railway Co.*, 115 LRRM 3635 (N.D. Ohio 1983) [Available on WESTLAW, DCT database] (prohibiting negotiation of individual severance agreements), and *Southern Pacific Transportation Company v. Brotherhood of Railway, Airline and Steamship Clerks*, 636 F.Supp. 57 (D.Utah 1986) (same). The district court stated that like the present case, both *C & O* and *Southern Pacific*

> involved individual severance agreements where bargained-for furlough programs were in place. Because the proposed individual agreements circumvented the union's involvement in an established subject of collective bargaining, and because this circumvention occurred in areas occupied by existing collective agreements, those courts found the railroads' conduct to be illegal.

This Court sees no significant difference between those cases and the present one. If these company/individual agreements were to be allowed, the union would be denied the right of access to formal negotiation concerning compensation for severance; a right secured to it by Section 6. Further, these events occur in a setting in which an existing furlough plan is in place. Under these conditions, the Court finds that Soo Line's conduct violates the RLA and its underlying policies. [Citation omitted.]

Thus, the court held that injunctive relief is appropriate and enjoined the Soo Line from entering into individual separation agreements with employees represented by the Machinists' Union until such time as the Soo Line complies with the notice and bargaining procedures of section 6 of the RLA, 45 U.S.C. § 156.

## ANALYSIS

 The district court properly held that it had jurisdiction over the subject matter of the dispute. Under the RLA, the Soo Line has an obligation to bargain collectively with the Machinists' Union and to refrain from interfering with that Union's representation of its members. The United States Supreme Court decided in 1944 that an employer may not, in most instances, use individual contracts to defeat the procedures prescribed by the National Labor Relations Act. It stated:

> [T]he individual contract cannot be effective as a waiver of any benefit to which the employee otherwise would be entitled under the trade agreement. The very purpose of providing by statute for the collective agreement is to supercede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. Its benefits and advantages are open to every employee of the represented unit, whatever the type or terms of his pre-existing contract of employment.
>
> * * * We are not called upon to say that under no circumstances can an individual enforce an agreement more advantageous than a collective agreement, but we find the mere possibility that such agreements might be made no ground for holding generally that individual contracts may survive or surmount collective ones. The practice and philosophy of collective bargaining looks with suspicion on such individual advantages. Of course, where there is great variation in circumstances of employment or capacity of employees, it is possible for the collec-

tive bargain to prescribe only minimum rates or maximum hours or expressly to leave certain areas open to individual bargaining. But except as so provided, advantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long range expense of the group as a whole.

*J.I. Case Co. v. National Labor Relations Board*, 321 U.S. at 338–39, 64 S.Ct. at 580–81.

The principles enunciated in *J.I. Case Co.* are equally applicable to employees covered by the RLA rather than the National Labor Relations Act. *Order of Railroad Telegraphers v. Railway Express Agency*, 321 U.S. 342, 64 S.Ct. 582, 88 L.Ed. 788 (1944). The precise evil identified in *J.I. Case Co.* is present here.[1] The Machinists' Union and the Soo Line have negotiated a labor protective agreement which specifically sets forth the benefits that employees who are laid off as a result of the merger are to receive.[2] These benefits exceed those available to employees who accept voluntary separation. It is obvious that the Soo Line will benefit if it can obtain agreements from employees to retire voluntarily and to waive their rights under the labor protective agreement signed by the compa-

ny and the union. (It will pay those employees voluntarily separating from service less than it would pay those employees separating as a result of the merger under the labor protective agreement.) It is equally obvious that voluntary retirement under the company's terms is attractive to some employees. As might be expected, the eight machinists who initially accepted voluntary separation were older employees to whom separation was attractive. They were eligible for retirement benefits, were paid $15,000, and guaranteed continuation of their health benefits in exchange for, in effect, retiring a few years early. These employees were not necessarily those who would have been eligible to receive benefits under the labor protective agreement. The fact that the Soo Line and certain individual employees will benefit is not, however, sufficient, in and of itself, to find a violation of the RLA. The important thing is that these agreements have an adverse impact on the machinists as a group.

The impact on the union and its members of the voluntary separation plan will be significant. As a result of the individual agreements, work has been or will be transferred from one facility to another, seniority and bidding rights of some employees will inevitably be affected, and some employees will, in all probability, be deprived of the opportunity to be separated under the terms of the labor protective agreement. Although the jobs of the remaining employees may be more secure after voluntary separation of some machinists, they would have also become more

**1.** The Soo Line cites *Clausen v. Burlington Northern, Inc.,* 98 LRRM 2844 (D.Mont.1978) [Available on WESTLAW, DCT database] in support of its action. We do not believe the case supports Soo Line's position. In that case the district court simply dismissed the plaintiff's complaint *without* prejudice for failure to allege that the employer's actions were inconsistent with the collective bargaining agreement.

**2.** The Soo Line argues that an employee protective agreement signed by the parties is not a collective bargaining agreement within the purview of *J.I. Case Co.* and therefore the Soo Line can enter into voluntary separation agreements with individual employees even if the agreements are in derogation of the terms of the protective agreement. We disagree. Once a

labor protective agreement is negotiated and signed by the employer and the union, it has the same status as the collective bargaining agreement it may modify. We do not read *Antonioli v. Lehigh Coal and Navigation*, 451 F.2d 1171 (3rd Cir.1971) to hold to the contrary. Two of the three counts in the complaint were dismissed on statute of limitation grounds and the third count on res judicata or, alternatively, law of the case grounds. In note 15, the court states that an individual employee may waive his rights under a labor protective agreement for valid consideration. An employee may do so if the agreement between himself and the railroad company is not in derogation of the rights of others. No such claim was asserted in *Antonioli.*

secure if employees were separated pursuant to the labor protective agreement.

The Soo Line argues that some of the layoffs were unrelated to the merger and were caused by a decline in business activity. It points out that in these circumstances the employees laid off would not be eligible for any benefits under the labor protective agreement. This is true, but at least some of the employee layoffs were a result of the merger. The bottom line is that the union, as the representative of all of the machinists, is entitled to balance the advantages and disadvantages of any proposed plan and to negotiate with respect to them. One thing is certain; every employee who accepts voluntary separation decreases the likelihood of the Soo Line being required to compensate an employee under the labor protective agreement.

The Soo Line and the Machinists' Union attempted to negotiate a new separation agreement, presumably an agreement to provide for the separation of certain employees and to establish separation allowances for affected employees. The agreement presumably would have applied to separations whether caused by loss of business or by virtue of the merger, but the parties were unable to reach an agreement. At this point, the Soo Line was requested to follow the procedure set forth in the RLA. *See* 45 U.S.C. § 156 (requiring 30–day notice of intended change in agreement). Instead, it proceeded unilaterally with its plan for a voluntary separation and in so doing, violated the clear and specific terms of the RLA. *See id.* ("carriers * * * shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions."); 45 U.S.C. § 152 seventh ("No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in Section 156 of this title").

Alternatively, the Soo Line argues that if there is a labor dispute, it is a minor rather than a major dispute. The district court found to the contrary and we agree. The dispute does not involve interpretation of either the collective bargaining agreement or the labor protective agreement. It rather involves an effort on the part of the Soo Line to ignore both of these agreements and to negotiate individually with the employees on a matter which is a subject of mandatory bargaining. Therefore, the Soo Line cannot meet its "relatively light burden" of showing that its action is at most a minor change in the agreements of the parties. *See Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co.,* 802 F.2d 1016, 1022 (8th Cir.1986).

The judgment of the district court is affirmed.

MAGILL, Circuit Judge, dissenting.

I dissent. The majority holds that the district court properly had jurisdiction over what was a major dispute. I believe, however, that the events at issue here cannot be characterized as a dispute and thus are not subject to collective bargaining under the Railway Labor Act. Moreover, assuming *arguendo* that a dispute exists, I believe it is unquestionably a minor, rather than a major, dispute and thus was insufficient to vest the district court with jurisdiction, but rather, should have been submitted to binding arbitration.

This case has its genesis on February 19, 1985. On that date, the Soo Line acquired the Chicago, Milwaukee, St. Paul and Pacific Railroad Company (Milwaukee) from its trustee in bankruptcy.

On March 1, 1985, the Soo Line and the Machinists' Union (Union) entered into a collective bargaining agreement (CBA). The CBA was negotiated pursuant to the Railway Labor Act, and set out rules concerning working hours and conditions, layoffs, promotions and seniority, and grievances and discipline. The CBA made no mention whatsoever of an employee's voluntary resignation.

Pursuant to the acquisition of Milwaukee (Acquisition) the Soo Line entered into an employee protective agreement (Protective Agreement) with the Union on September 10, 1985. The Protective Agreement was

required by 49 U.S.C. § 11343 *et seq.*, which mandates that conditions protective of labor be established when specified railroad transactions take place. As the preamble of the Protective Agreement states:

The purpose of this agreement is to provide pursuant to 49 U.S.C. Section 11347 of the Interstate Commerce Act, as amended, and the Milwaukee Restructuring Act, for fair and equitable arrangements to protect the interests of Employees *adversely affected by the Acquisition;* and to provide for expedited changes in services, facilities, operations, seniority and existing collective bargaining agreements to enable the expanded railroad system created by the Acquisition to be operated in the most efficient manner, as one completely integrated railroad. (Emphasis added.)

As the majority opinion accurately summarizes, "[t]he agreement provides that existing collective bargaining agreements shall be preserved. It states that any employee of the merged railroad company *laid off as a result of the acquisition of the Milwaukee* is entitled to certain benefits from the Soo Line, including a severance allowance which, depending on the employee's length of service, could exceed $38,000." Maj. op. at 731 (emphasis added). The majority later notes that the Protective Agreement "specifically sets forth the benefits that employees *who are laid off as a result of the merger* are to receive." At 734 (emphasis added). Thus, the majority appears to recognize two key aspects of the Protective Agreement: (1) that it only applies to employees who are "affected," or laid off, and (2) that it only applies if the layoff is the result of the Acquisition.

Despite this recognition, the majority then holds that the Protective Agreement bars employees, not found to be affected by the Acquisition, from voluntarily deciding to resign and from seeking the lump-sum separation agreement made available by the Soo Line (Individual Plan). Such an extrapolation of the Protective Agreement is unwarranted and unsupported.

The error in this regard began in the district court, which failed to make any findings as to whether or not the eight Union members who sought the Individual Plan were affected by the Acquisition. Such a finding is essential in this case, because of the carefully circumscribed conditions necessary to trigger application of the Protective Agreement. From what I can discern of the district court's vague analysis, the court apparently concluded that any furlough or reduction in work force, whether specifically related to the Acquisition or not, would cause the Protective Agreement to apply.[1] Even a cursory reading of the Protective Agreement shows that such a sweeping interpretation is wrong. The majority, rather than correcting the district court's erroneous analysis, both accepts and compounds it. After noting the Soo Line's argument that some of the "layoffs" (as termed by the majority) were unrelated to the Acquisition, and accepting as true the proposition that in these circumstances, the "laid-off" employees could not benefit from the Protective Agreement, the majority then concludes that "at least some of the employee layoffs" were the result of the Acquisition. Maj. op. at 735. This imprecise analysis is wrong in three respects. First, the employees at issue were not laid off but came forward voluntarily, seeking the Individual Plan.[2] Second, there was no finding in the

---

1. The district court's analysis of this issue is as follows:

 If these company/individual agreements were to be allowed, the union would be denied the right of access to formal negotiation concerning compensation for severance; a right secured to it by Section 6. Further, these events occur in a setting in which an existing furlough plan is in place. Under these conditions, the Court finds that Soo Line's conduct violates the RLA and its underlying policies."
 District Court Order at 8.

2. Indeed, the instances in which the Soo Line offered the Individual Plan involved other unions and were not disputed. In this case, the Union employees who opted for the Individual Plan approached the Soo Line on their own accord. Thus I am skeptical of any argument that the Union employees at issue were affected by the Acquisition, because their position had been unchanged by the Acquisition until they decided, for reasons personal to them, to approach the Soo Line seeking individual lump-sum separation agreements.

district court that "some," or for that matter any, employees at issue were affected by the Acquisition. Third, assuming a finding that some employees were so affected, the Protective Agreement would apply to only those employees but could not be used to bring within its scope employees to whom it clearly does not apply, namely, those employees who were not affected by the Acquisition.

I also reject the majority's conclusion that the CBA and the Protective Agreement prohibit the Individual Plan. The district court accepted that both the CBA and the Protective Agreement were silent on the issue of individual lump-sum separation agreements. District Court Order at 6. The majority concludes, however, that the issue of individual voluntary resignation, which is nowhere mentioned in either the CBA or the Protective Agreement, nonetheless falls within the scope of these agreements and qualifies under them as a major dispute.[3] I take issue with the majority's effort not only to fit a square peg into a round hole, but to remove the peg from its correct hole in order to do so. It seems clear to me that if an issue is not covered by an agreement, then the issue is simply not covered. The Individual Plan offered by the Soo Line has no conflicting effect on either the Protective Agreement or the CBA.

There is no effect on the Protective Agreement because of the accepted fact that the Protective Agreement makes no mention whatsoever of voluntary lump-sum separation plans. Thus the Protective Agreement is inapplicable to this case, first because it applies only to employees affected by the Acquisition, and as I have noted, there were no findings that the eight Union employees at issue were so affected, and second, because even if these employees had been affected by the Acquisition, the Soo Line's actions in this case neither ran afoul of nor remotely approached any prohibition in the Protective Agreement. Similarly, the Individual Plan does not controvert the CBA. Of great importance in this regard are the statements of Mr. Jensen, counsel for the Union, speaking before the district court:

> I asked [Ms. Cathy Frankenberg, Director of Labor Relations for the Non-operating Crafts with the Soo Line Railroad] whether or not there was anything that allowed what the Burlington or Soo Line was doing, whether there was anything in the collective bargaining agreement allowing it or prohibiting it, she said no. And I think that's true. * * * Rest assured *if there was something in the collective bargaining agreement or the protective agreement that the Soo Line was violating by entering into these separation agreements we would have grieved it* and we would have take[n] it to the Systems Board.

Hearing Transcript at 51 (emphasis added).

The majority next concludes that the presumed dispute is major, not minor, and thus requires mandatory bargaining. The majority notes that the dispute does not involve interpretation of either the CBA or the Protective Agreement. The majority then summarily concludes that the Soo Line is trying "to ignore both of these agreements and to negotiate individually with the employees on a matter which is a subject of mandatory bargaining." Maj. op. at 735. This statement presumes its own conclusion.

The Supreme Court set out the difference between major and minor disputes in *Elgin, J. & E. Railway Co. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945):

> [I]t is clear from the [Railway Labor] Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.
>
> The first ["major" disputes] relates to disputes over the formation of collective

---

**3.** Although the majority cites no case law, *see* maj. op. at 734 n. 2, I accept for purposes of this argument their contention that the Protective Agreement has the status of a collective bargaining agreement.

agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

The second ["minor" dispute] class, however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries.

Elgin, 325 U.S. at 722–23, 65 S.Ct. at 1289–90 (citations omitted, emphasis added). The Supreme Court went on to explain that major disputes involve "large issues about which strikes ordinarily arise" while minor disputes represent individual disputes, "aris[ing] incidentally in the course of an employment" and are "of a detailed or individual quality." Id. at 724, 65 S.Ct. at 1290.

The district court, upon whose analysis the majority relies, found this dispute to be major because it did not require review of "the status of either labor or management at the interstices of an agreement. Instead, the case presents fundamental issues of whether or not a person may even be an employee or a member of a union. We are not defining an inter-employment relationship, but the fundamental nature of the employment relationship itself." District Court Order at 6.

I believe, however, that under applicable law this issue, if at all a dispute, is a minor one. This dispute does not relate to "the formation of collective agreements or efforts to secure them." Elgin, 325 U.S. at

723, 65 S.Ct. at 1290. No one seeks to change the terms of the existing agreements or bring a new one into being; rather, as the testimony established, the CBA and the Protective Agreement simply do not cover this issue. This issue falls squarely within the definition of a minor dispute as an "omitted case," because it is founded upon an incident of the employment relation independent of those covered by both the CBA and Protective Agreement.

The message of J.I. Case, relied upon by the majority, is that individual employment contracts may exist side-by-side with a collective bargaining agreement. J.I. Case, 321 U.S. at 336–37, 64 S.Ct. at 579–80. This message was repeated in Order of Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 347, 64 S.Ct. 582, 585, 88 L.Ed. 788 (1944): "Collective bargains need not and do not always settle or embrace every exception. It may be agreed that particular situations are reserved for individual contracting, either completely or within prescribed limits." This message was forcefully restated in Caterpillar Inc. v. Williams, —— U.S. ——, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). The Court stated: "J.I. Case does not stand for the proposition that all individual employment contracts are subsumed into, or eliminated by, the collective-bargaining agreement." The Court then noted that "a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, * * * so long as the contract relied upon is not a collective-bargaining agreement." Caterpillar, 107 S.Ct. at 2431–32. The Individual Plan at issue here can stand side-by-side with both the CBA and the Protective Agreement, because it is not covered by either agreement, nor does it detract from rights created by the two agreements. Rather, the Individual Plan represents the employees' assertion of their legal right to contract individually by seeking a retirement option available to them.

The district court and the majority both cite Brotherhood of Railway, Airline and Steamship Clerks v. Chesapeake and Ohio Railway Co., 115 LRRM 3635 (N.D.

Ohio 1983) [Available on WESTLAW, DCT database], and *Southern Pacific Transportation Co. v. Brotherhood of Railway, Airline and Steamship Clerks*, 636 F.Supp. 57 (D.Utah 1986), for the proposition that individual lump-sum separation agreements may not coexist with pre-established collective agreements. I believe these cases are inapposite. The *Chesapeake and Ohio* court found first that the voluntary separation plan violated the Railway Labor Act because it "would constitute individual agreements which subtract from the collective bargaining agreement and result in a diminution of defendant's obligation under the collective bargaining agreement." *Chesapeake and Ohio*, 115 LRRM at 3639. In that case, however, the applicable collective bargaining agreement contained specific employment protection provisions and furlough allowances that far exceeded any protection afforded to the machinists in this case under either the CBA or the Protective Agreement. During the hearing in the district court, the following interchange took place between counsel for the Soo Line and Ms. Frankenberg, Director of Labor Relations for the Non-operating Crafts with the Soo Line:

Q. What is the difference in the level of protection afforded the BRAC employees under the agreement with the C & O and the level of protection afforded the machinists under this current dispute?

A. In the BRAC agreement an employee who has performed three or more years of service with the C & O in the clerical craft—

THE COURT: Is employed for life?

THE WITNESS: And has a bolted position, has a life time protection to certain obligations that they must meet.

\* \* \* \* \* \*

THE WITNESS: And that can be differentiated from that protection which the machinists have because they have to be affective [sic] in order to be eligible for protection and the cap on that protection is six years.

Q. So basically after a certain period of time they [the *Chesapeake and Ohio* clerks] have lifetime protection.

A. The clerks [in the *Chesapeake and Ohio* case] do, yes. Hearing Transcript at 41–42.

Another distinction is that unlike the BRAC agreement in the *Chesapeake and Ohio* case, here the major protection given to employees is limited to employees who can prove that they are "adversely affected" by the Acquisition. The Individual Plan thus does not subtract from the CBA as did the individual lump-sum separation agreements in *Chesapeake and Ohio*, nor is the Soo Line's obligation under the CBA or Protective Agreement diminished by the Individual Plan.

The *Southern Pacific* case, also relied on by the majority, appears to have adopted the rationale of *Chesapeake and Ohio, see Southern Pacific*, 636 F.Supp. at 59, and accordingly I do not find it to be any more persuasive authority.

In sum, the two cases are inapposite for the reason that their existing agreements provided a much higher level of protection for employees, thus in effect "closing the door" to a voluntary lump-sum separation plan, while the CBA and Protective Agreement in this case, by virtue of their silence on the subject, can coexist with a voluntary lump-sum separation plan. Indeed, any language in the Protective Agreement which could be arguably construed as touching upon a voluntary lump-sum separation plan appears to allow such a plan. Section 9 of the Protective Agreement provides in part:

Nothing in this agreement shall be construed as depriving any Employee of any rights or benefits \* \* \* which such Employee may have under existing job security or other protective conditions or arrangements; provided, however, that if an Employee is eligible for protection under both this Agreement and some other \* \* \* arrangements, such Employee shall elect between protection under this Agreement and protection under such other agreement.

Thus any interpretation of the Protective Agreement which concludes that it somehow covers a voluntary lump-sum separation plan must also conclude that such a

plan does not violate, but rather, is contemplated by, the Protective Agreement.[4]

Contrary to the district court's and the majority's reliance on *Chesapeake and Ohio* and *Southern Pacific,* I find other cases more convincing. In *Chambers v. Burlington Northern, Inc.,* 692 F.2d 109 (10th Cir.1982), an employee protective agreement similar to the one at issue was entered into pursuant to a merger. The railroad and an employee, however, had made an individual contract under which the employee relinquished seniority rights and accepted a transfer to another location in exchange for a lump-sum payment. The court affirmed dismissal of the complaint for lack of jurisdiction, on the ground that the plaintiff's claims raised "minor disputes for determination by the Adjustment Board, not the courts." *Chambers,* 692 F.2d at 112.

Similarly, in *Clausen v. Burlington Northern, Inc.,* 98 LRRM 2844 (D.Mont. 1978) [Available on WESTLAW, DCT database] an employee accepted an individual lump-sum payment in lieu of any benefits he might accrue pursuant to a merger protection agreement. The collective bargaining agreement in effect at the time had no provision applicable to seniority or transfer allowances. Contrary to the plaintiff's assertion that the existence of the collective bargaining relationship between the railroad and the Union precluded individual contracts, the court held that plaintiff's argument was "clearly faulty" under *J.I. Case* and failed to state a claim. *Clausen,* 98 LRRM at 2845–46. *See also Antonioli v. Lehigh Coal and Navigation Co.,* 451 F.2d 1171, 1175–76 (3d Cir.1971), *cert. denied,* 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972) ("The validity of these documents [lump-sum retirement agreements which waived rights under an ICC labor protection order] as evidencing a knowing and intelligent waiver of rights is established by this record. Therefore, plaintiffs' claim must fall on the additional ground of the existence of a valid waiver of the asserted rights.").

Finally, the majority asserts that the Individual Plan has an adverse impact on the machinists as a group. In support, the majority states that seniority and bidding rights of some employees will inevitably be affected. Certainly seniority rights will be affected; however, the effect on existing Union members will be a positive, not a negative one. As a result of the demand made by these eight machinists, all over sixty years old, for the Individual Plan, the seniority of remaining Union members will be increased. The majority further states that the Individual Plan may deprive some employees of the opportunity to be separated under the terms of the Protective Agreement. I do not follow this statement. Any employee who opts for the Individual Plan is not being deprived, but is making a free choice. An employee who decides against the Individual Plan remains as eligible as ever for the benefits of the Protective Agreement. The Individual Plan has no impact on the terms of and benefits offered by the Protective Agreement. It merely represents an alternative open to the free choice of the employees. The majority then concedes that the remaining employees will have greater job security after some machinists opt for the Individual Plan, but argues that this would also be the case if employees were separated pursuant to the Protective Agreement. That may be so, but it fails to show any adverse impact on remaining employees as a result of the Individual Plan.

In sum, because I believe the better-reasoned case law combined with common-sense analysis supports allowance of the Soo Line's Individual Plan, I think the dis-

---

**4.** This interpretation finds further support in section 8 of the Protective Agreement, which provides that if a dispute should arise with respect to the "interpretation, application or enforcement of any provisions of this [Protective] Agreement, it may be referred by any party to an arbitration board for resolution in accord with the provisions of Article I, Section 11 of the New York Dock Conditions." The Eighth Circuit has concluded that this language imposes mandatory and binding arbitration of disputes. *Hoffman v. Missouri Pacific Railroad,* 806 F.2d 800, 801 (8th Cir.1986).

trict court did not have jurisdiction in this case. Accordingly, I dissent.