Granite State Packing v. Local 633    CV-94-156-JD   09/05/95
                    UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE

Granite State Packing Co., Inc.

        v.                                      Civil No. 94-156-JD

Local 633, International Brotherhood
of Teamsters, Chauffeurs, Warehousemen
and Helpers of America


                                O R D E R


        The plaintiff, Granite State Packing Company, Inc. ("the

Company"), has filed a single-count complaint seeking to vacate

an arbitration award.  The defendant, Local 633, International

Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of

America ("the Union"), has brought a counterclaim seeking to have

the award enforced.  Currently before the court are cross motions

for summary judgment (documents nos. 9 and 11).  Jurisdiction is

grounded upon § 301 of the Labor Management Relations Act, as

amended, 29 U.S.C. § 185, The United States Arbitration Act, 9

U.S.C. § 10 and 28 U.S.C. § 1331.



                            Background[1]

        The following facts are undisputed.  The Company delivers

meat products down the east coast and as far west as Chicago.

_____

        [1]These facts are drawn from the parties submissions and the
arbitration award decision.  The parties have agreed to treat the
award decision as a joint stipulation of facts.

The Company initially delivered hanging beef but later expanded, distributing a full line of finished products. Because the products were not palletized, the driver had to enter the truck and rotate the products. Delivery and rotation of products therefore required lengthy periods of time, often exceeding more than two hours per delivery.

Through 1981, drivers were paid an hourly wage. A driver would be paid from the time he picked up a load until the time he returned to the Company facility. Drivers were paid for as many as 100 hours per week, often receiving two separate checks out of concern for federal regulations.

In 1981, the Department of Transportation ("DOT") conducted an audit of the Company. The DOT found that the Company was in gross violation of regulations concerning the maximum number of hours worked by drivers. In order to conform with a DOT ultimatum that it enforce the regulations, it was necessary for the Company to change its method of payment to drivers.

At the time of the audit there was a collective bargaining agreement in effect. Despite some reluctance on the part of the Union's business agent, discussions regarding a new form of compensation took place. Negotiations were conducted by Lester Shapiro, president of the Company, Earl Chamberland, distribution manager for the Company, and Richard Vachon, business agent for

2

Local 633.  The parties agreed that drivers would be paid on a per mile basis, receiving a certain number of cents per mile as well as payments associated with each stop and each pallet.  This new payment system was reflected in a collective bargaining agreement.  The parties referred to the new form of payment as "incentive compensation."  While no driver would lose money under the new system, a driver who "produced," i.e., moved quickly, could increase his income.  See Arbitration Award Decision at 5 (quoting testimony of Earl Chamberland).  As a result, the company experienced an "astronomical" increase in equipment utilization and realized significant savings.  Id.

During the discussions regarding the revised payment system, the parties were unable to agree upon delay time compensation.  Specifically, the parties could not agree upon payment for delays associated with delivery or pick up.  The company agreed to pay fifteen dollars per delivery or pick up, fifteen dollars being the functional equivalent of two-hours salary.  The Company felt that delay time payment should not be received until the delay exceeded two hours.  The Union disagreed with the Company's characterization that the fifteen dollars "bought two-hours of delay time."  No agreement was formalized.  Instead, the Company promised that it would be "fair" and the Union replied that if

3

the Company was not fair, then the issue would be revisited during the next round of contract negotiations.

During the next several years, the issue of delay time remained unresolved. Drivers continued to demand payment for the total amount of delay time and the Company was inconsistent in its response. Sometimes drivers were paid for total amount of delay and sometimes only for the amount of delay time after two hours were deducted.[2] A number of grievances were processed by the Union with respect to the payment of delay time.

In 1984, the distribution of products that were not palletized ceased. Palletization dramatically reduced the amount of time that a driver had to devote to each delivery stop.

In 1988, the Company and the Union became parties to a collective bargaining agreement ("contract") with a term of January 1, 1988, through December 31, 1990. The contract did not

---

[2]As Chamberland testified at the arbitration hearing,

> Drivers would feel that they should get [delay time] and sometimes, depending on the situation, they'd get it and other times not. They were looking for delay time over and above like for five hours. He would want to get the time from when he arrived. I'd say no. I get the two hours and you get the three hours.

Arbitration Award Decision at 7-8, see also id. at 9-10 (testimony of retired dispatcher Tobias, noting inconsistent nature of delay time payment).

4

address the delay time issue.  The contract did contain a
grievance and arbitration procedure which read as follows:

> (a) All grievances pertaining to the meaning,
> interpretation or application of the provisions of this
> agreement on the part of any employee of the Union,
> which cannot be resolved between the Employer and the
> Union representative within seventy-two hours, may,
> within a reasonable time, thereafter, be referred to
> arbitration in the following manner; the Union shall
> apply to the State of New Hampshire Mediation for the
> appointment of an arbitrator to hear the grievance of
> an issue.  Nothing herein shall prevent the Employer
> and the Union from mutually agreeing, in writing, on
> the selection of an arbitrator.

> (b) The decision of the arbitrator shall be final
> and binding upon all parties concerned.  The fees and
> expenses of the arbitrator shall be borne equally by
> the Employer and the Union.

Collective Bargaining Agreement at Article VIII, see Muskat
Affidavit, ¶ 5 at exhibit 1 to Plaintiff's Memorandum in Support
of Motion for Summary Judgment.

During 1991, the parties entered into new labor negotia-
tions.  Negotiations were conducted by Irwin Muskat, now
president of the Company, and Leo Kelley, now business agent for
the Union.   Again, the subject of delay time was raised.  Again,
the parties were unable to resolve the issue.  The Company
asserted that because there was nothing in the contract regarding
delay time, the Company was under no obligation to pay workers
for delay time.  The Union took the position that delay time was
an established past practice and therefore binding upon the

5

Company.  Following the parties inability to resolve the delay time issue, Muskat consulted with his attorney.  On February 25, 1991, on the advise of his attorney, Muskat sent the following letter to the Union:

> As per our discussions of today we have discovered that payments are being made by this company erroneously.  Therefore, we are putting you on notice that we are reserving our right to exercise our option to eliminate these erroneous payments and will advise you of our decision.

The Union, through Kelly, sent the following response:

> In response to your communication to me dated February 25, 1991 and received on March 1, 1991, in regard to erroneous payments made by your Company to your drivers, I strenuously object to your position.

> As we discussed, your Company has been making these payments to your drivers for several years now and in addition, I recently discussed this situation with the former negotiator for Local 633, Business Agent Richard Vachon and he relates to me that your Company has agreed to this method of payment.

> In light of this condition of employment negotiated by the union, any denial of payment to your drivers would be a direct violation of the collective bargaining agreement and it would be processed through the grievance procedure.

The parties continued to discuss the matter and sometime during the summer of 1991, Vachon was brought into the discussions.  Vachon produced a handwritten document from the 1981 meeting.  According to Vachon, the document had been received from the Company and represented the agreement that he,

Shapiro, and Chamberland came to regarding the new mileage based compensation system.  Paragraph 2(b) of the document states:

> The Company will be responsible for delays of working time at a delivery or pick-up, if it is the Customer or Backhauls fault.  Not if you say "arrived at a York at 11 am," knowing no delivery from 11 am to 1 pm or other such delivery instructions or early for a backhaul appointment. [sic]

See Arbitrator Award Decision, Appendix A.[3]  The company denied all knowledge of the document and disputed its relevancy to the negotiations.

Negotiations ended in 1991, without the parties resolving the delay time issue.  The parties reduced their agreements to contract form ("successor agreement"), but did not sign the successor agreement.  The parties assented to abide by the successor agreement for the 1991-93 period and agreed to arbitrate the delay time issue.  The successor agreement contained the same grievance and arbitration procedure as the 1988 contract.

In June 1993, the parties participated in a three-day hearing before Arbitrator Richard Higgins ("arbitrator").  The Company argued that the issue could be resolved by the arbitrator ruling solely on whether the Company had divested itself of any past-practice liability by renouncing the continuation of any

---

[3]At arbitration, the Company representatives testified that none had seen the handwritten document prior to 1991.

7

past practice which the Union alleged existed.  The Company contended that such action served to terminate any obligation to the Union.  The Company asserted that there was no binding past practice with respect to delay time and that it had no contractual obligation to pay delay time.  The Union argued that the issue before the arbitrator was that of an "interest" arbitration, wherein the parties placed the delay time issue before the arbitrator to be determined by the arbitrator.  The Union asserted that the parties agreed to an interest arbitration as the method of resolving the last negotiating issue remaining between them.

At the close of the hearing, the parties were unable to frame the issue to be put before the arbitrator.  The Company proposed the following question:

> Did the Company violate the Contract by the manner in which it has paid drivers delay time?  If so, what shall the remedy be?

The Union phrased the issue differently:

> We say we have established common practice that has never made the Contract but has been lived up to and paid throughout the present time.

Because they were unable to stipulate as to the issue before the arbitrator, the parties agreed to allow the arbitrator to frame the issue.

Arbitrator Richard Higgins issued his decision on February 27, 1994. The arbitrator stated as follows:

> Having studied the testimony and argument regarding what was agreed in 1991, I am satisfied that this is in essence an "interest" arbitration. It is not an "interest" arbitration based solely upon whether the Arbitrator believes that delay time is appropriate or inappropriate. This is an interest arbitration where the parties have agreed to abide by the Arbitrator's determination as to whether delay time represented a binding obligation during the Contract preceding Joint Exhibit 1. The Company has left one thing out of its analysis of how binding past practices may be terminated. There is nothing in the provision in Elkouri and Elkouri, which was cited by the Company, which states that the final event in the renunciation of the past practice is an arbitration on that issue. While the Company may have intended in February of 1991 to terminate its obligation under any past practice, it went on in the latter stages of 1991 to agree to arbitrate this issue. Any agreement to arbitrate under these circumstances is a separate and distinct event from what the company asserts was its recantation of February 1991.

Arbitrator Award Decision at 17-18.

The arbitrator went on to find that (1) the parties had agreed to resolve the delay time issue by arbitration; (2) that since 1981, there has been some understanding regarding delay time which did not find its way into the contract; (3) the Company's agreement to be "fair" during the 1981 negotiations embodies the "understanding"[4]; and (4) payment of delay time is

---

[4]Thus, the focus of the arbitrator's decision concerned the "fairness" of delay time pay. According to the Company, delay time payments would be tantamount to "double dipping." The Company argued that if a driver appeared at a delivery site and

had to wait one hour, but was able to accomplish the delivery the second hour, the driver would receive two payments: the single delivery payment of fifteen dollars and the delay time payment. The arbitrator refuted the Company's argument, noting

[t]he reason these parties are having such a difficult time explaining the concept of delay time to each other is that they are talking apples and oranges. Mr. Chamberland continually stated that the "first two hours are mine" when describing that the parties agreed to pay a single delivery payment associated with an amount approximating two hours at the hourly rate. I accept Mr. Chamberland's assertion. However, his assertion, based on circumstances as they existed prior to 1984, is not at odds with the Union's position in this case. If we go back to a time prior to 1984, according to the testimony of Mr. Muskat, deliveries prior to 1984 often took more than two hours. The product was not palletized until 1984 and deliveries often involved the rotation of products inside a customer's facility. Thus, an individual could be involved in a delivery of from three to four hours, etc. Once the parties converted to mileage, some accommodation had to be worked out as to how the delivery which exceeded two hours would be handled since the per delivery stop payment was based on two hours.

If we picture a somewhat typical delivery in 1982, then clearly when a three hour delivery occurred, the "first two hours belonged" to Mr. Chamberland and anything beyond two hours had to be paid to the driver in order to be "fair". That was the deal that was struck in 1981 and that is where the fact that a "per stop payment equals two hours" comes into play. I am satisfied that there were few, if any, collisions between the "per delivery stop" payment and delay time until 1984. Prior to 1984, deliveries took up to and over two hours because of the product style and the services rendered to the customer.

In 1984, the ballgame changed. Loads were now palletized and the driver had no involvement in servicing the customer by rotating the product. Both Mr. Muskat and Mr. Chamberland testified that under

10

fair. The arbitrator concluded that the Company was obligated during the 1991-93 period to continue delay time payments associated with a delivery which are (1) not the fault of the driver; (2) reported to the Company by the driver at the time the delay occurs; and (3) consistent with past delay time claims made by union members. The arbitrator made no finding as to any continuing obligation, noting that the parties were free to enter into any agreement during negotiations for future contracts.

---

these circumstances, drivers could be in and out of a delivery often in fractions of one hour as opposed to taking more than two hours. This represented a dramatic change in circumstances. What is important to note, however, is that the record of the arbitration hearing is absolutely devoid of any reference to any discussion between the Union and the Company in 1984 or shortly thereafter to respond to this change. Drivers were getting in and out of well under, in most cases, the two hours which until 1984 had been the benchmark, both for computation of the "per delivery stop" and for purposes of determining when the driver would begin to receive an hourly payment, i.e. beyond two hours.

The arbitrator then examined the enormous windfall received by the Company as a result of the 1991 change, and the pre-1981 payment system wherein all delays of any sort were paid by the Company. The arbitrator determined that the Company wished to have the same payment satisfy two-obligations: delay time and per delivery stop.
The arbitrator concluded that this type of compensation system would be unfair and, thus, delay time payment must be allowed. See Arbitrator Award Decision, 21-23.

Discussion

## I. Standard of Review

Summary judgment is appropriate when material facts are undisputed and the moving party is entitled to judgment as a matter of law. Rodriguez-Garcia v. Davila, 904 F.2d 90, 94 (1st Cir. 1990) (citing Fed. R. Civ. P. 56(c)). The burden is on the moving party to establish the lack of a genuine, material factual issue, Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence. Caputo v. Boston Edison Co., 924 F.2d 11, 13 (1st Cir. 1991).

## II. Review of Arbitration Awards Generally

The law views the arbitration process with great favor. United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 80 S. Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of Am. v. Enterprise Wheel and Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L.Ed.2d 1424 (1960) (collectively the "Steelworkers Trilogy"). In the series of opinions referred to as the Steelworkers Trilogy, the Supreme Court emphasized that arbitration plays a unique role in the

12

labor context.  <u>Federated Dept. Stores v. Commercial Workers Union, Local 1442</u>, 901 F.2d 1494, 1496 (9th Cir. 1990).  Arbitration is the preferred method for resolving disputes between a union and an employer.  <u>Pheonix Newspapers v. Phoenix Mailers Local 752</u>, 989 F.2d 1077, 1080 (9th Cir. 1993); <u>see</u> <u>Larocque v. R. W.F. Inc.</u>, 8 F.3d 95, 96 (1st Cir. 1993).

The scope of review of an arbitrator's decision is extremely narrow.  <u>United Paperworkers Int'l Union v. Misco, Inc.</u>, 484 U.S. 29, 36-37, 108 S. Ct. 364, 369-70, 98 L.Ed.2d 286 (1987).  Because the grievance procedure is part of the collective bargaining process, <u>Warrior and Gulf Co.</u>, 363 U.S. at 581, 80 S. Ct. at 1352, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." <u>Enterprise Wheel & Car Corp.</u>, 363 U.S. at 599, 80 S. Ct. at 1362.  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." <u>Misco</u>, 484 U.S. at 38, 108 S. Ct. at 371; <u>see</u> <u>Larocque,</u> 8 F.3d at 96.

13

There are three circumstances under which a court may vacate an arbitration award. Notwithstanding the presumption in favor of arbitration, however, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Warrior & Gulf, 363 U.S. at 582. Thus, no deference is accorded an arbitrator's decision which does not draw its essence from the collective bargaining agreement, Enterprise Wheel & Car Corp., 363 U.S. at 597, 80 S. Ct. at 1361. In addition, the court may vacate an award that is outside the boundaries of the issue submitted to the arbitrator, Pack Concrete, Inc. v. Cunningham, 866 F.2d 283, 285 (9th Cir. 1989); or contrary to public policy, Misco, 484 U.S. at 42, 108 S. Ct. at 373. In the instant case, the Company argues that the decision does not draw its essence from the collective bargaining agreement. In particular, the Company argues the arbitrator exceeded his authority by rendering an interest arbitration award without any contractual provision permitting him to do so. Plaintiffs Memorandum in Support of Motion for Summary Judgment at 2.

## II. Interest v. Rights Arbitration

"Interest" arbitrations may be contrasted with "rights" arbitrations. Because most arbitration agreements limit the

14

powers of arbitrators and prohibit them from adding to, subtracting from, or modifying the agreement's terms, private arbitration generally involves only the settlement of grievances concerning rights recognized by the agreement. See Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289 (1945); see generally, Frank Elkouri & Edna A. Elkouri, How Arbitration Works 98-117 (4th ed. 1985). In a rights arbitration, the arbitrator is required to interpret and enforce its terms. Burley, 325 U.S. at 723, 65 S.Ct. at 1289. In contrast, interest disputes, involve new matters to be settled by the parties through negotiations. Id. Because the subject of the dispute is not governed by an existing agreement, interest arbitration establishes future rights, either by execution of a new agreement or by modification of the existing one. Id. Characterized broadly, grievance or rights arbitration seeks adjudication while interest arbitration settles basic terms and conditions of employment not previously agreed upon. See Amalgamated Transit Union, Local Div. 589 v. Massachusetts, 666 F.2d 618, 620 (1st Cir. 1981) ("Unlike `grievance arbitration,' which involves the interpretation and application of existing contractual provisions, `interest arbitration' involves the creation of new substantive contractual terms, which will govern the parties' future relations.") (quoting Elkouri & Elkouri, How

15

*Arbitration Works* 47-48 (3d ed. 1973)), cert. denied 457 U.S.

117, 102 S. Ct. 2928 (1982).

The difference between rights and interest arbitration has

been summarized as follows:

> Questions involving the role and rights of the individual in labor arbitration are far more likely to arise in connection with "rights" arbitration than in connection with "interest" arbitration. In rights arbitration a grievant is claiming a violation of rights under an applicable collective bargaining agreement. A grievance has been filed under the grievance procedure provisions of the applicable collective bargaining agreement and it has been processed in accordance with the terms of this procedure to the final steps -- which normally is arbitration. . . .
>
> On the other hand, "interest" arbitration, which is used much less frequently than rights arbitration, involves mutual agreement of an employer and an union to arbitrate the question of what shall be the terms of a new collective bargaining agreement or what revisions shall be made in the terms of an expiring or expired collective bargaining agreement. In interest arbitration, the issues are more likely to involve such broad questions as general increases in pay in the overall wage structure, installation of a new job classification program, an increase or decrease in the number of paid holidays and broad concession matters in times of economic stress etc.

Herbert L Sherman, Jr., *The Role of the Individual in Labor*

*Arbitration*, 15 WMLR 379 (1989).[5]

---

[5]In contrast, the most common types of grievances which are arbitrated in rights arbitration involve questions of whether employees have been discharged for just cause, whether an employer had just cause to impose disciplinary suspensions on employees, whether the seniority provisions of the collective bargaining agreement have been properly applied to an employee

The arbitration involved in the instant case is an interest arbitration. The arbitrator explicitly characterized the proceeding as an interest arbitration and there is no objection to this characterization from either party. In addition, both parties confirmed during the arbitration proceedings that no contract ever contained an agreement concerning delay time payments. It necessarily follows that an interest arbitration occurred as there was no existing contractual provision regarding delay time for the arbitrator to interpret. Likewise, the nature of the dispute involved a broad general question involving the employee wage structure, a quintessential "interest" dispute.

## III. Analysis

The Company challenges the arbitrator's award on the ground that it was forced to participate in an unauthorized interest arbitration. In support, the Company relies heavily on Lodge 802, Int'l Bhd. of Boilermakers v. Pennsylvania Shipbuilding Co., 835 F.2d 1045 (3rd Cir. 1987); Pennsylvania Power Co. v. Local Union No. 272 of Int'l Bhd. of Electrical Workers, 886 F.2d 46 (3d Cir. 1989); and Phoenix Newspapers, 989 F.2d 1077. In Pennsylvania Shipbuilding, the International Brotherhood of

_____

who has grieved, and whether the wage provisions of a collective bargaining agreement have been properly applied to a grievant.

17

Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL-CIO ("Brotherhood") brought suit in federal district court seeking an order compelling the Pennsylvania Shipbuilding Company to arbitrate the issues of pay and job classifications relative to the assignment of employees to load and unload manifested ships' cargo. 835 F.2d at 1045. The Brotherhood relied on the general presumption in favor of arbitration recognized by the Supreme Court in the Steel Workers Trilogy. Id. at 1046. The Third Circuit noted that the Brotherhood was seeking an interest arbitration as opposed to a rights arbitration by asking that an arbitrator set new terms and conditions of employment governing the loading and unloading of ships. Id. (citing Elkouri and Elkouri, How Arbitration Works 98-117 (4th Ed. 1985). The court discussed how the arbitration provisions of the collective bargaining agreement contemplated only "rights" arbitration and held that Pennsylvania Shipbuilding could not be forced to participate in an unauthorized interest arbitration. The other cases relied upon by the Company involve factual situations wherein an arbitrator exceeded his authority by rendering an interest arbitration award. See Phoenix Newspapers, 989 F.2d at 1082 (reversing district courts characterization of remedy as rights arbitration and vacating interest arbitration award as supplementing collective bargaining

18

agreement and, therefore, not drawing essence from collective bargaining agreement); Pennsylvania Power, 886 at 47-48 (vacating arbitrator conclusion that grievance over wage rate, which company argued issue outside the collective bargaining agreement, was arbitrable).

The Company analogizes the instant case to Pennsylvania Shipbuilding, Pheonix Newspapers and Pennsylvania Power. The Company notes that the grievance and arbitration procedure set forth in the 1988-90 contract and the 1991 successor agreement is virtually identical to that set forth in Pennsylvania Shipbuilding. Plaintiff's Memorandum in Support of Motion for Summary Judgment at 13. The Company reasons that because an interest arbitration has occurred, and because there is a grievance and arbitration procedure limiting arbitration to rights arbitration, the court must vacate the award.

The cases cited by the Company are inapposite. In each case, the employer was either disputing arbitration or participating in arbitration as a requirement of the collective bargaining agreement. Because the collective bargaining agreements at issue only authorized rights arbitration, the respective courts concluded that any interest arbitration was outside the "essence" of the agreement. However, in the instant case, arbitration on the issue of delay time was wholly unrelated

19

to the contract or to the successor agreement.  In 1981, the Company agreed to be "fair."  In 1988, the issue of delay time payment was not addressed.  In 1991, the dispute began anew.  The Company sent a letter "putting [the Union] on notice that [it was] reserving [its] right to exercise [its] option to eliminate . . . erroneous payments and [would] advise [the Union] of [its] decision."  The Union responded that "any denial of payment to your drivers would be a direct violation of the collective bargaining agreement and it would be processed through the grievance procedure."  Had the Company then declared there would be no delay time payment and the Union invoked arbitration, then this court would confront the issue posited by the Company.  However, this is not what occurred.  According to the facts set out by the arbitrator in his decision, described supra, and explicitly adopted by the Company, see document no. 17, negotiations on the issue continued for another six months, with the parties ultimately agreeing to allow an arbitrator to settle the delay time dispute.  At that instant, the Company agreed to participate in an interest arbitration.

The purpose of the arbitration agreed to by the parties was to determine whether drivers would receive delay time payments.  Unlike the circumstances implicated in the cases cited by the Company, the Union neither sought to force the Company into an

20

unauthorized arbitration nor did an unauthorized arbitration take place. The Company participated willingly, understanding the nature of the arbitration hearing in which it agreed to participate. The Company now relies on its submission to the arbitrator to support its argument that it never acquiesced in an interest arbitration. See Memorandum of Law in Support of Motion for Summary judgment at 13-14. The Company asked the arbitrator to determine whether the Company violated the contract by the manner in which it has paid delay time. It is disingenuous for the Company to now argue that it had only acquiesced to a rights arbitration. The Company could not violate the contract by the manner in which it paid delay time. There is nothing in the contract concerning delay time payment. By agreeing to arbitrate, the Company agreed to arbitrate the issue of delay time, not the question of whether delay time was somehow embodied in the contract. By agreeing to arbitrate the issue of delay time, the Company knowingly agreed to participate in an interest arbitration. Thus, the award cannot be vacated as outside the essence of the collective bargaining agreement as the arbitration was never conducted under the rubric of a collective bargaining agreement.[6]

---

[6]The court has not been asked to consider and therefore does not consider the effect of an arbitration conducted outside of and supplemental to a collective bargaining agreement.

Finally, the Company argues that "even if there were some conceivable basis for the arbitrator to render an `interest' award," the court should nevertheless vacate the award for three reasons: (1) interest awards are not afforded the same deference as rights awards; (2) the arbitrator's award is inconsistent with the issue as he framed it; and (3) the arbitrator substituted his own notion of industrial justice for that contemplated by the parties. Plaintiff's Memorandum in Support of Motion for Summary Judgment at 15-18.

First, the fact that interest awards are not afforded the same deference as rights awards is not in itself a reason to vacate an award. Second, the court finds that the arbitrator's award is consistent with the issue framed. The arbitrator phrased the issue as follows:

Is the Company obligated to pay "delay time" during the period January 1, 1991 through December 31, 1993.

If so, is any remedy warranted?

Arbitration Award Decision at 1. The Company argues that this formulation is evidence that the arbitrator recognized he was supposed to render a "rights" arbitration. The court disagrees. The formulation reflects that the arbitrator was issuing an award that would supplement the successor agreement. Third, the court finds that the arbitrator's award does not reflect his own notion of industrial justice as the award is not "unfounded in reason

22

and fact" or "based on reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling." See Challenger Caribbean Corp. v. Union General de Trabajadores de Puerto Rico, 903 F.2d 857, 861 (1st Cir. 1990) (citing In re Hotel Davinci, 797 F.2d 33, 34 (1st Cir. 1986)). The Company argues that an award is "unfounded in reason" because it is not supported by the collective bargaining agreement between the parties. However, as discussed in depth supra, the the arbitration award is wholly separate and distinct from either the contract or the successor agreement.[7] Thus, the Company's secondary attacks on the award also fail.

## Conclusion

The plaintiff's motion for summary judgment on the complaint (document no. 9) is denied. The defendant's motion for summary judgment on counterclaim (document no. 11) is granted. The arbitration award issued by Richard Higgins on February 27, 1994,

---

[7]In addition, the Company argues that delay time payment had been specifically disavowed by the Company during the contract negotiations, which had the effect of rendering any such practice null and void. In support, the Company makes a naked reference to the Elkouri & Elkouri treatise. An unsupported bald assertion is insufficient to satisfy the Company's burden under Fed. R. Civ. P. 56.

23

is hereby confirmed.  The clerk of court is directed to close the case.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
Chief Judge

September 5, 1995

cc:  Edward A. Haffer, Esquire
     Herbert L. Turney, Esquire
     Stephen F. Lynch, Esquire
     Terrence J. Daley, Esquire